SANSONE OLDSMOBILE–CADILLAC, INC., PLAINTIFF, v. THE BOARD OF ADJUSTMENT OF THE BOROUGH OF SHREWS-BURY, DEFENDANT, CAROL A. HANLON, DEFENDANT-INTERVENOR.

Superior Court of New Jersey
Law Division Monmouth County

March 18, 1986.

*James J. Shrager,* for plaintiff (*Hannoch & Weisman,* attorneys).

*Robert H. Otten,* for defendant Board of Adjustment of the Borough of Shrewsbury (*Crowell & Otten,* attorneys).

*John J. Anastasio,* for defendant-intervenor Carol A. Hanlon.

MILBERG, A.J.S.C.

The narrow issue presented in this action in lieu of prerogative writs is whether an applicant before a board of adjustment has an absolute right to withdraw a pending variance application, without prejudice, prior to a formal vote thereon.

Plaintiff, Sansone Oldsmobile-Cadillac, Inc. (Sansone) operates an automobile dealership located on Newman Springs Road in the Borough of Red Bank, Monmouth County, New Jersey. In or around 1984, Sansone became the contract-purchaser of a certain tract of land (hereinafter the tract or the premises) consisting of 6.51 acres located almost directly across the street from its car dealership but situated in the Borough of Shrews-

bury. The tract was previously occupied by a supermarket, which was destroyed by fire several years ago. Except for the market's foundation, the premises have since remained vacant.

Sansone proposed to upgrade the tract into an automobile dealership comprising two buildings—a showroom with offices and a service/parts facility—together with a parking area, a car storage facility and other related improvements. Appropriate buffers between the premises and the existing residential area were also contemplated.

Under the zoning ordinance for the Borough of Shrewsbury, the tract is located in a "B–2" zone, which permits general businesses of the small neighborhood type but does not allow automobile dealerships.

Accordingly, on June 19, 1984, Sansone applied for preliminary and final site plan approval, use and bulk variances, permission to erect an eight-foot high buffer fence, and approval for an oversized, free-standing sign.

Public hearings were held before the Shrewsbury Board of Adjustment (board) on July 5, August 1, September 5, October 3, and November 7, 1984. The stenographic records of the hearings indicate that virtually the entire length of each board meeting was devoted to the presentation of either Sansone's or the objectors' case with respect to the application.

On December 5, 1984, the board deliberated on the application and apparently decided to deny the variance.[1] The deliberations of the board are contained in the minutes of the meeting of December 5, 1984.[2] Board Chairman Kroll opened the discussions:

---

[1]Sansone's application had been previously bifurcated; the site plan application was no longer before the board.

[2]Although a stenographic record of the board's proceedings on December 5 would be desirable, it appears that none was made. Nevertheless *N.J.S.A.* 40:55D–9(c) requires only that minutes be kept and that the minutes adequately represent the findings of the Board. *Battaglia v. O'Brien,* 59 *N.J.Super.* 154, 172

The floor is open as far as the Board members are concerned to a discussion of the application before us and what the feeling of the Board is with respect to the application and what sort of Resolution we should ask our attorney to draw up for us to vote on at our next meeting.

Chairman Kroll then defined the "overriding issue" before the board as "should we grant a use variance for this property." Following a discussion among the board members as to what should be considered on Sansone's application for a use variance, Kroll continued:

[I]t is the sort of thing that there ought to be some real overwhelming reasons, special reasons for doing it which I don't feel were given. There were no real special reasons given as far as why this use should be permitted on this parcel of property in place of the use for which it was zoned other than the arguments that it hasn't sold for that use which is a bit attenuous [sic] because no one ever knows what sort of an offer might have been made.

Board member Clarke then discussed the "pro's and con's" of Sansone's application, whereupon he concluded:

I think if we were to approve this variance we would be hitting a part of our town which is very important and I think that there would be a detrimental effect to that area which I am certainly willing to listen to other Board members positions on this point, I feel this would not be a wise thing to do at this time, to put in the applicant's new car dealership.

Board member Sarpolus agreed with Clarke. Board member Beers agreed with Clarke in large part but added that he did not foresee any more inconvenience—specifically, the annoyances of traffic and lighting—presented by the proposed dealership than that presented by a shopping center, the use for which the premises had previously been employed. Nevertheless, he determined that "[t]here is no overriding reason to upset the B–2 [zone]."

Board member McGuire discussed the evidence presented on the application and concluded: "I individually did not find that the applicant made out a case for special reasons as I define it."

(App.Div.1960); *Caldwell v. Lambrou,* 161 *N.J.Super.* 284, 287 (Law Div.1978); *see also Hudanich v. Avalon,* 183 *N.J.Super.* 244, 258 (Law Div.1981). I find that the minutes submitted, together with the transcripts of the previous board hearings, provide a more than adequate record for review on this appeal.

At the conclusion of these discussions, Chairman Kroll directed the board attorney, Robert H. Otten, "to put together a Resolution denying the application as [that] was the consensus of the Board." [3]   Kroll added that the resolution would be submitted for a vote of the board at the regular meeting of the board scheduled for January 2, 1985.

By letter dated December 12, 1984, Sansone attempted to withdraw its application without prejudice.  At the meeting of the board on January 2, 1985, the request to withdraw the application was discussed at length.  The minutes [4] of that meeting demonstrate that, after serious consideration, the request was submitted to a formal vote, with members Kroll, Clarke, Beers and McGuire participating.  All four members voted to deny the request, whereupon they proceeded to discuss the resolution prepared by the board attorney.  After certain revisions, the same four members adopted the resolution denying Sansone's variance application.[5]

Thereafter, on February 25, 1985, Sansone commenced this action in lieu of prerogative writs attacking the board's denial of its request to withdraw the application and demanding a reversal of the denial of the variance.  On April 26, 1985, I granted Carol A. Hanlon, an objector, leave to intervene as a defendant.

At the pretrial on January 7, 1986, Sansone abandoned all contentions save the claim respecting the board's denial of its request to withdraw the variance application without prejudice.

At the trial on February 27, 1986, it was agreed that if it is determined that a vote on the application in fact occurred at the

[3]Board members Darrah and Ticehurst were disqualified from hearing the Sansone application.

[4]These minutes are adequate for purposes of review.  See discussion at n. 2, *supra.*

[5]Sansone nevertheless closed title on and assumed ownership of the premises.

meeting of the board on December 5, 1984, any right to withdraw the application was terminated. If, however, it is determined that a vote did not occur, then two issues must be resolved: (1) whether the right to withdraw an application prior to a vote thereon is absolute or subject to the board's discretion; (2) if discretionary with the board, then whether there was an abuse of discretion under the circumstances.

## I.

*Did the deliberations of the board at the meeting of December 5, 1984, constitute a vote to deny the application?*

■ I find that a vote denying the variance did not, in fact, occur at the meeting of the board on December 5, 1984.

Counsel for the board argues that the deliberations of the board members constituted a vote—that the resolution drafted for adoption at the meeting of January 2, 1985, was merely the "memorialization" process described in *N.J.S.A.* 40:55D–10(g)(2). That section, however, speaks in terms of a previous "vote," not prior deliberations. *See also N.J.S.A.* 40:55D–70(d).

Indeed, to equate deliberations with a vote would impose on a reviewing court the needless burden of piercing board discussions to discern whether, under the circumstances of the particular case, an unequivocal negative or affirmative determination was reached. This I shall not foster.

While it appears in this case that the Board members indicated by their discussions an intention to deny the variance, they were not bound by their preliminary deliberations. A formal vote was necessary; one did not occur here.

## II.

*The withdrawal of Sansone's application—an absolute right or subject to the board's discretion?*

■ The Municipal Land Use Law, *N.J.S.A.* 40:55D–1 *et seq.*, contains no provision regarding the right of an applicant to

withdraw, without prejudice, an application before a zoning board of adjustment prior to a formal decision thereon. There is no reported decision of a court of this State bearing on the issue. Nevertheless, upon review of relevant case law, I conclude that such a withdrawal is subject to the discretion of the board.

I begin with the premise that a zoning board of adjustment is an independent administrative body acting in a *quasi*-judicial capacity. *Rogoff v. Tufariello*, 106 *N.J.Super.* 303, 308 (App. Div.), certif. den. 54 *N.J.* 583 (1969); *Reinauer Realty Corp. v. Nucera*, 59 *N.J.Super.* 189, 201 (App.Div.), certif. den. 32 *N.J.* 347 (1960); *see Kramer v. Board of Adj., Sea Girt*, 45 *N.J.* 268, 282 (1965). While its function is termed *"quasi*-judicial," a board of adjustment "partakes of the judicial" nonetheless, *Handlon v. Belleville*, 4 *N.J.* 99, 104 (1950); *West Milford Tp. Planning Bd. v. Tp. Council*, 123 *N.J.Super.* 135, 144 (Law Div.1973); accordingly, many of the principles and doctrines developed by and for the courts have developed upon proceedings before boards of adjustment and other administrative tribunals. *See generally Hill Homeowners v. Passaic Bd. of Adj.*, 129 *N.J.Super.* 170, 178–179 (Law.Div.1974), aff'd 134 *N.J.Super.* 107 (App.Div.1975).

Recently, in *City of Hackensack v. Winner*, 82 *N.J.* 1 (1980), the New Jersey Supreme Court recognized that "there are important goals to be achieved from the prudent and selective application in administrative proceedings of such [court-fashioned] doctrines as *res judicata*, collateral estoppel, and the single controversy rule." *Id.* at 31. Although the Court cautioned that the "procedures and techniques developed to handle the operation and business of the courts may not be transported *in toto* or imported wholesale into administrative agencies," *id.* at 29, it concluded:

Nevertheless, in practice, since there are pronounced similarities in the exercise of judicial and *quasi*-judicial powers, it has been recognized that court-fashioned doctrines for the handling of litigation do in fact have some genuine utility and relevance in administrative proceedings. But, in applying such court-based

precepts to administrative agencies, their potential for achieving sound results must be tempered by a full appreciation of an agency's statutory foundations, its executive nature, and its special jurisdictional and regulatory concerns. [*Ibid.*]

The Court went on to state:

We previously alluded to the underlying principles of our modern constitutional structure of government that have resulted in a strong and centralized executive. As a matter of generality, legislative enactments in the administrative area presumably reflect this organic theory of our state government. Hence it is consistent with this constitutional philosophy to apply to administrative agencies, in appropriate situations, judicial rules conducive to the ends of intergovernmental compatibility and harmony, such as *res judicata,* collateral estoppel, the single-controversy doctrine and the like. Decisions have stressed that the policy considerations which support these judicial doctrines—namely, finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness—have an important place in the administrative field ... *It seems evident that such principles, while basically judicial in origin, have especial relevance for administrative adjudications.* [*Id.* at 32–33; emphasis supplied; citations omitted]

The policy considerations which underpin the application to *quasi*-judicial administrative proceedings of such judicial principles as *res judicata,* collateral estoppel, the single controversy doctrine and the like, also support the selective application of the New Jersey court rules.

There is nothing novel in doing so. In *Princeton Research Lands, Inc. v. Princeton Tp. Planning Bd.,* 112 *N.J.Super.* 467 (App.Div.), certif. den. 57 *N.J.* 291 (1970), the Appellate Division held that, since the township committee was acting in a *quasi*-judicial capacity in hearing an appeal from the planning board, it should have applied *R.* 1:3–3 (regarding service of a notice or paper by mail) in determining whether the appeal was timely.[6] *Id.* at 471.

In the present case, I find that Sansone's request to withdraw its variance application without prejudice is akin to a motion by

---

6  I note that the single or "entire" controversy doctrine, which is applicable to *quasi*-judicial, administrative proceedings, *see City of Hackensack v. Winner, supra,* 82 *N.J.* at 32, has been incorporated expressly in *R.* 4:27–1(b) and implicitly in *R.* 4:5–1 and *R.* 4:7–1.

a plaintiff in the Superior Court for leave to take a voluntary dismissal of his complaint without prejudice pursuant to *R.* 4:37–1(b). Rule 4:37–1(b) provides:

> Except as provided by paragraph (a) [7] hereof, an action shall be dismissed at the plaintiff's instance only by leave of court and upon such terms and conditions as the court deems appropriate. If a counterclaim has been filed and served by a defendant prior to the service upon him of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

A dismissal under *R.* 4:37–1(b) is subject to judicial discretion. *See Burke v. Central Railroad Co. of N.J.,* 42 *N.J.Super.* 387, 395–398 (App.Div.1956). An application under the rule calls upon the court to evaluate any prejudice which would result to the litigants, as well as to the public interest, if a dismissal without prejudice were granted. *State v. Tenenbaum,* 151 *N.J.Super.* 273, 279 (App.Div.1977); *see Burke v. Central Railroad Co. of N.J., supra,* 42 *N.J.Super.* at 397–398.

In *Union Carbide Corp. v. Litton Precision Products, Inc.,* 94 *N.J.Super.* 315 (Ch.Div.1967), the court commented on *R.R.* 4:42–1(b), now *R.* 4:37–1(b), as follows:

> It has been adopted to protect a defendant from the duplication of the normal costs of litigation. The evil aimed at by the rule "is present in any instance in which a defendant is damaged by being dragged into court and put to expense with no chance whatever (if there is a dismissal without prejudice) of having the suit determined in his favor. The obvious purport of our rule is to protect a

---

[7]Paragraph (a) of the rule permits a litigant to take a voluntary dismissal without leave of court by filing a notice of dismissal prior to service by the adverse party of an answer or a motion for summary judgment, or by filing a stipulation of dismissal signed by all parties who have appeared in the action.

It would be inappropriate to consider *R.* 4:37–1(a) in a proceeding such as this since responsive pleadings or motions, or any papers analagous thereto, are not required. *But cf. R.* 8:3–9, which provides that "[w]hether or not a responsive pleading has been filed, a complaint or a counterclaim may be withdrawn at any time prior to the close of the proofs before the Tax Court and thereafter with leave of Court." There is, however, authority to the effect that even if the proofs have not closed, the consent of the tax assessor must be sought. *Clinton Tp. Citizen's Comm. v. Clinton Tp.,* 185 *N.J.Super.* 343 (Law Div.1983).

litigant where a termination of the proceedings without prejudice will place him in the probable position of having to defend, at additional expense, another action based upon similar charges at another time. [94 *N.J.Super.* at 317; citation omitted]

These same policy considerations were emphasized in *City of Hackensack v. Winner, supra,* 82 *N.J.* at 32–33, the Court there concluding that such considerations, including "basic fairness," have "especial relevance for administrative adjudications." *Id.* at 33.

I conclude, therefore, that where an applicant seeks to withdraw, without prejudice, a pending application before a zoning board of adjustment, the principles of *R.* 4:37–1(b) should be applied. Accordingly, the grant or denial of Sansone's request was subject to the board's discretion.

I find that the board did not abuse its discretion in denying Sansone's request to withdraw its variance application. In line with the considerations to be made by a court in the fact of a motion under *R.* 4:37–1(b), the board members discussed at length the consequences and implications of such a withdrawal after all the evidence has been presented and reviewed. Among the considerations were (1) the considerable amount of time spent on the application; (2) the lack of finality and, with that, a foreclosure of an application of the doctrine of *res judicata* upon a subsequent submission of the identical application; (3) the fact that the matter had been fully presented and deliberated upon; and (4) the interests of the objectors, who had retained counsel and incurred expenses, and who had a right to expect a conclusion of the matter at the meeting of January 2, 1985.

Yet, the board could have granted the withdrawal request on certain terms and conditions. *R.* 4:37–1(b). For example, the board could have required Sansone to reimburse the Borough of Shrewsbury and the objectors for all expenses, including attorneys' fees, incurred on the variance application. *See Burke v. Central Railroad Co. of N.J., supra,* 42 *N.J.Su-*

*per.* at 398; *Fehnel v. Fehnel,* 186 *N.J.Super.* 209, 214 (App. Div.1982).

Thus, while the board did not act arbitrarily or capriciously in denying the withdrawal request, it should have at least considered during its deliberations any appropriate terms or conditions for granting a withdrawal of the application without prejudice. The matter is therefore remanded to the board for this purpose. This remand, however, should not be construed as a directive to the board to grant Sansone's request on terms. The board is only directed to consider any appropriate conditions for the withdrawal at its next meeting and to report its determination to the court, which will retain jurisdiction for this purpose alone.

The board will submit a proposed form of judgment.