221 N.J. Super. 407 (1987)
534 A.2d 1019
ALLIED REALTY, LTD., PLAINTIFF-APPELLANT,
v.
BOROUGH OF UPPER SADDLE RIVER AND THE PLANNING BOARD OF THE BOROUGH OF UPPER SADDLE RIVER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 1987.
Decided November 30, 1987.
*408 Before Judges DREIER and BAIME.
*409 Barry J. Cohen argued the cause for appellant (Amster & Rosensweig, attorneys; Barry J. Cohen, on the brief).
Richard C. McDonnell argued the cause for respondents (McDonnell & Whitaker, attorneys; Richard C. McDonnell, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Plaintiff Allied Realty, Ltd. (Allied) appeals from a judgment of the Superior Court, Law Division, sustaining the action of defendant Upper Saddle River Planning Board (Board) denying its application for minor subdivision approval.[1] The trial judge upheld the Board's determination that Allied's application was barred by the doctrine of res judicata and collateral estoppel. On appeal, Allied contends that the trial judge incorrectly accorded preclusive effect to a prior resolution of the Board dealing with the same property. Allied further argues that the Board failed to take timely action in accordance with the provisions of the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 et seq., and, therefore, the trial judge should have deemed its application to have been automatically approved.
Unfortunately, the salient facts are somewhat complex. Allied is the owner of property located at 75 Brookside Drive, Upper Saddle River  also known as Lots 1 and 3, Block 1014 on the current tax assessment map of that borough. In 1978, Lot 1 was zoned commercial in its entirety, but Lot 3 was partially within the residential and commercial zones. Allied wished to develop the property and thus applied for site plan approval. In its application, Allied proposed to construct an 8,000 square foot building with appurtenant parking on all of Lot 1 and on the commercially zoned portion of Lot 3.
*410 On September 28, 1978, the Board adopted a resolution granting site plan approval. In its findings, the Board recited:
3. The applicant, by its own choice, has determined that it wishes to consolidate Lots 1 and 3 and to construct a commercial building utilizing all of the commercially-zoned property and not to use the balance of the lot for any structures. [Emphasis added].
The meaning of this language is not altogether clear. According to Peter J. Odo, a member of the Board, this finding was intended to convey the understanding of the parties that site plan approval was conditioned upon Allied's promise not to develop the remainder of Lot 3. In direct contrast, Anthony Salafia, chairman of Allied, testified that, under the resolution, no additional commercial structures could be built on the portion of the lot zoned residential. The record of the proceedings before the Board has not been submitted to us. We note, however, that, in the resolution, the Board's approval of the site plan is expressly made subject to several specific conditions and no mention is made of the understanding that the balance of Lot 3 would not be further developed.
In any event, in June 1985, Allied sought subdivision approval for the Brookside Drive property in order to develop that portion of the lot in the residential zone. In its application, Allied also requested a bulk variance because the lot was undersized. On June 12, 1985, Allied hand-delivered to the Board its application for subdivision approval, together with filing, legal and engineering escrow fees.
The application was initially considered by the Board at its regularly scheduled work session on July 16, 1985. What ensued at the meeting is subject to considerable debate and interpretation. It is undisputed that Mr. Odo, at the very outset, noted his objection to the Board's consideration of Allied's application, which he contended was barred by the prior resolution granting site plan approval. It is uncontradicted that the Board adopted Mr. Odo's position and considered its prior resolution as preclusive and this determination was unmistakenly conveyed to Mr. Salafia. According to Mr. Odo, the *411 chairman told Mr. Salafia that Allied's application was denied "in view of the 1978 resolution." He testified that someone used the expression "case closed." This was corroborated by Mr. Salafia who testified that the chairman stated the "application [is] denied." According to Mr. Salafia, this was followed by the chairman's comment that the "case [was] closed."
Much of the testimony at trial concerned whether Allied requested a public hearing. Although this was a hotly contested issue, the record remains largely ambiguous. Mr. Salafia testified that after the Board denied Allied's application, either he or Allied's attorney asked whether there was a right to a public hearing. According to Mr. Salafia, the chairman then "turned to the [clerk]" and instructed her "to [schedule] a hearing." Mr. Salafia testified that, as he left the meeting, it was his impression that Allied's application remained pending and that he would later be advised of the date of the public hearing.
In his testimony, Mr. Odo agreed that after the Board denied Allied's application, either Mr. Salafia or Allied's attorney asked whether there was a right to a public hearing. At this point, however, Mr. Odo's account of what transpired diverges from that of Mr. Salafia. According to Mr. Odo, the chairman responded that Allied was "entitled to a hearing." Allied's attorney then replied, "Is that all there is?" Mr. Odo testified that the chairman commented, "That's it unless you want to do something else," at which point Mr. Salafia and Allied's attorney left the meeting. It is abundantly clear from the record that the Board was of the view that the matter had been concluded and that Allied did not intend to pursue it further.
The matter remained dormant until August 27, 1985. On that date, Allied's attorney wrote to the Board and requested that a public hearing be scheduled. The Board responded by erroneously stating that no formal application had been filed. Upon receipt of this response, counsel for Allied telephoned the clerk of the Board, who advised him that it was her impression *412 the application had been considered and denied at the July 16th meeting. On September 26, 1985, Allied's attorney again wrote to the Board and requested that a public hearing be scheduled. Thereafter, on October 15, 1985, the engineer retained by the Board sent a letter which was forwarded to Allied, noting that the application was incomplete and requesting additional information. This letter was followed by two communications from Allied's attorney, the first, dated November 5, 1985, asking for clarification whether the Board's determination at its July 17th meeting was final, and the second, furnishing to the Board the information requested by its engineer and forwarding the "revised" subdivision. In the second letter, dated December 12, 1985, Allied's attorney "request[ed] that the matter be deemed complete and scheduled for [a] hearing before the Board." The attorney also asked for a "certified list of property owners." On December 17, 1985, the Board's engineer acknowledged receiving the information requested and represented to the Board that the application was complete.
On January 23, 1986, the date ultimately set for the public hearing, Allied advised the Board that it did not intend to appear at the meeting. In its letter, Allied recited its position that because the Board failed to take action within 120 days of its completed application, the automatic approval provision set forth in N.J.S.A. 40:55D-61 was operative. In that regard, Allied contended that its application was complete as of July 29, 1985, 45 days from the date it was originally filed. Since the Board had neither certified the application as complete nor notified Allied of deficiencies within the requisite 45-day period, it was asserted that, under N.J.S.A. 40:55D-10.3, the 120-day period within which municipal action was required to be taken commenced running on July 29, 1985. Since no municipal action had been taken within that time period, Allied requested a certificate of the administrative officer granting automatic approval pursuant to N.J.S.A. 40:55D-61.
The Board denied Allied's application at its January 23rd meeting. The Board's determination was memorialized in its *413 resolution, adopted on February 27, 1986, which noted, as reasons for its denial, the preclusive effect of the 1978 resolution and Allied's dilatory conduct in first requesting a hearing and then failing to appear.
Allied thereafter instituted an action in lieu of prerogative writ, challenging the Board's determination. Following an evidentiary hearing, the trial judge determined that the Board properly denied Allied's application on the basis of res judicata and collateral estoppel. Judgment was entered accordingly.
We reverse. We are fully convinced that the Board's summary denial of Allied's application on res judicata and collateral estoppel grounds constituted error. However, we are also persuaded that, under the rather peculiar circumstances presented, the automatic approval provisions of the MLUL are not operative. We are thus constrained to remand the matter to the Board for consideration of Allied's application on the merits. We will review these questions in seriatim.

I.
We first consider whether the 1978 resolution barred Allied from seeking further development of the property. At the outset, we recognize that there are important goals to be achieved from the prudent and selective application of res judicata and collateral estoppel principles in administrative proceedings. See City of Hackensack v. Winner, 82 N.J. 1, 31 (1980); Hinfey v. Matawan Regional Board of Education, 77 N.J. 514, 532 (1978); Lubliner v. Bd. of Alcoholic Bev. Con., Paterson, 33 N.J. 428, 442 (1960); Trap Rock Industries, Inc. v. Sagner, 133 N.J. Super. 99, 109 (App.Div. 1975), aff'd by a divided court 69 N.J. 599 (1976). Our decisions have stressed that judicial doctrines conducive to the policy of finality and repose are often appropriate to administrative hearings. See, e.g., Charlie Brown of Chatham v. Board of Adjustment, 202 N.J. Super. 312, 327 (App.Div. 1985); Springsteel et al. v. Town of West Orange, et al., 149 N.J. Super. 107, 113 (App.Div. 1977), *414 certif. den. 75 N.J. 10 (1977); Cohen v. Fair Lawn, 85 N.J. Super. 234, 237 (App.Div. 1964); Hill Homeowners v. Passaic Zon. Bd. of Adj., 129 N.J. Super. 170, 179 (Law Div. 1974), aff'd 134 N.J. Super. 107 (App.Div. 1975). Res judicata and collateral estoppel have thus frequently been applied in municipal land use cases. See, e.g., Russell v. Tenafly Bd. of Adjustment, 31 N.J. 58, 65 (1959); Home Builders Assn. of Northern N.J. v. Paramus Bor., 7 N.J. 335, 342 (1951).
This much conceded, the rule of res judicata does not bar the making of a new application for a variance, or here for subdivision approval, or for modification or enlargement of one already granted, "or for lifting conditions previously imposed," Cohen v. Fair Lawn, supra, 85 N.J. Super. at 237, upon a showing that the continued enforcement of the restriction would frustrate an appropriate purpose. Changed circumstances or other good cause may warrant reconsideration by the local authorities. Ibid. See also Russell v. Tenafly Bd. of Adjustment, supra, 31 N.J. at 66. To hold differently would offend public policy by countenancing a restraint upon the future exercise of municipal action in the absence of a sound reason justifying such a static approach. Springsteel et al. v. Town of West Orange, et al., supra, 149 N.J. Super. at 113. The question for the municipal agency on a second application thus centers about "whether there has occurred a sufficient change in the application itself or in the conditions surrounding the property to warrant entertainment" of the matter again. Russell v. Tenafly Bd. of Adjustment, supra, 31 N.J. at 66.
Applying these principles here, it is plain that the Board's summary rejection of Allied's application was wholly improper. At the very least, it was incumbent upon the Board to afford Allied the opportunity to show that circumstances had changed since the 1978 resolution. Succinctly stated, the Board clearly erred by giving blind allegiance to the finding recited in its 1978 resolution. See Springsteel et al. v. Town of West Orange, et al., supra, 149 N.J. Super. at 112.
*415 We merely add the following brief comments for future guidance. From what has been said thus far, it is clear that a claim of res judicata or collateral estoppel should rarely, if ever, be treated in summary fashion by a municipal board. We have previously alluded to the policy of finality and repose upon which these doctrines rest. We do not suggest that prior board action can never have a preclusive effect upon a subsequent application. Nevertheless, the rule should not be mechanistically applied in a vacuum. Such a sterile approach would defeat the liberal review powers of the board. Rather, the circumstances surrounding the use and situation of the property should be freely considered and the applicant should be accorded a proper opportunity to show reasons why the prior municipal action should not be considered preclusive.
This leads us to perhaps a more basic question concerning application of the doctrine of res judicata and collateral estoppel in the context of the facts of this case. In essence, these principles bar a party "from relitigating a second time that which was previously fairly litigated and finally determined." Charlie Brown of Chatham v. Board of Adjustment, supra, 202 N.J. Super. at 327. It has been said that "[t]he general requirements for the invocation of the principle are a final judgment by a court or tribunal of competent jurisdiction, identity of issues, parties [and] cause of action." Ibid. Although "[t]he terms are sometimes used interchangeably and applied broadly," collateral estoppel "is that branch of the broader law of res judicata which bars relitigation of any issue or fact actually determined in a prior action, generally between the same parties while involving a different claim or cause of action." Ibid.
Against that backdrop, it cannot fairly be said with any degree of assurance that the Board in 1978 actually considered and determined the issue it now seeks to foreclose. We recognize that, absent changed circumstances, a party may be estopped from seeking further development of property where a prior approval is expressly conditioned on a restriction against *416 that course. Id. at 318, 327. In Charlie Brown of Chatham v. Board of Adjustment, supra, for example, site plan approval was granted "on the expressed condition" that the second floor of the restaurant would not be used as a residential unit. Id. at 318. We held that res judicata and collateral estoppel principles thus barred a second application by the owner to provide sleeping accommodations for its employees on the second floor. Id. at 327. Here, however, the 1978 site plan approval is not expressly conditioned upon a restriction on further development of the property. Rather, the "choice" of the applicant "not to use the balance of the lot for any structures" is set forth in the Board's findings. As we have pointed out, this "understanding" was not repeated in the conditions which are described in great detail in the resolution, and upon which the approval was granted.
It is axiomatic that a party who relies upon collateral estoppel must present to the second tribunal so much of the record of the first proceeding as may be necessary to show that an issue it seeks to exclude from the subsequent hearing was "necessarily determined" in the prior proceeding. State v. Ebron, 61 N.J. 207, 216 (1972). In the context of this case, the Board did not satisfy its burden of establishing that the earlier resolution was intended to be preclusive of all future development. Without a record of the original proceedings before the Board, there was no evidence submitted to the judge which would permit him to make a reasoned and informative determination that the doctrine of res judicata or collateral estoppel was applicable.
We thus conclude that the trial judge erred when he determined that the 1978 resolution was to be accorded preclusive effect. Consequently, the judgment entered, which was predicated solely upon this erroneous conclusion, is reversed.

II.
We next turn to Allied's argument that its subdivision application was automatically approved by reason of the Board's *417 dilatory conduct. Allied asserts that the Board failed to take action on its application within the time period prescribed by N.J.S.A. 40:55D-10.3 and N.J.S.A. 40:55D-61. We reject this claim.
We recognize that one of the principal purposes of the MLUL is to simplify and expedite land use applications. City of South Amboy v. Gassaway, 101 N.J. 86, 91 (1985). In furtherance of this objective, the Legislature required local planning boards to determine the completeness of applications and to pass upon the merits of the various requests made within specific time periods. N.J.S.A. 40:55D-10.3 thus provides in pertinent part:
An application for development shall be complete for purposes of commencing the applicable time period for action by a municipal agency, when so certified by the municipal agency or its authorized committee or designee. In the event that the agency, committee or designee does not certify the application to be complete within 45 days of the date of its submission, the application shall be deemed complete upon the expiration of the 45-day period for purposes of commencing the applicable time period unless: a. the application lacks information indicated on a checklist adopted by ordinance and provided to the applicant; and b. the municipal agency or its authorized committee or designee has notified the applicant, in writing, of the deficiencies in the application within 45 days of submission of the application.
In a similar vein, N.J.S.A. 40:55D-61 states:
Whenever an application for approval of a subdivision plat ... request[s] ... relief pursuant to section 47 of this act [which authorizes applications for bulk variances to municipal planning boards], the planning board shall grant or deny approval ... within 120 days after submission by a developer of a completed application to the administrative officer or within such further time as may be consented to by the applicant.... Failure of the planning board to act within the period prescribed shall constitute approval of the application and a certificate of the administrative officer as to the failure of the planning board to act shall be issued on request of the applicant....
Our Supreme Court has stated that it will "not countenance a permissive interpretation or application" of this statutory scheme. Manalapan Holding Co. v. Hamilton Tp. Plan. Bd., 92 N.J. 466, 482 (1983). See also City of South Amboy v. Gassaway, supra, 101 N.J. at 92; Lizak v. Faria, 96 N.J. 482, 494 (1984). "The statute prescribes strict timetables and a careful methodology." Manalapan Holding Co. v. Hamilton *418 Tp. Plan. Bd., supra, 92 N.J. at 482. "It does not imply waiver or relaxation of its terms." Ibid.
Nevertheless, application of the statutory time constraints must be anchored in the reason for their existence. The evil which the automatic approval provisions were designed to remedy was municipal inaction and inattention. We are persuaded that this legislative purpose would be unjustifiably distorted in a manner patently subversive to the public interest if the automatic approval mechanism were to be applied in a mechanical fashion here.
The overriding and critical fact is that the Board made its determination and rendered its decision at its meeting on July 16, 1985. At that meeting, there was substantial debate and considerable deliberation concerning the preclusive effect of the Board's 1978 resolution. As we took pains to note in our recitation of facts, the Board's denial, although ultimately a mistaken one on this record, was clearly and unequivocally conveyed to Allied and its attorney. In unmistakable terms, Allied was advised that its application was denied.[2] Of course, we are not unmindful of the fact that Allied's chairman left the meeting with the impression that the Board would later schedule a public hearing.[3] We, nevertheless, point out that the *419 Board was of the view that it had rendered a final determination on Allied's application and the matter had concluded. Our careful reading of the record convinces us that the Board's belief in that respect was entirely reasonable under the circumstances.[4]
It was not until September 26, 1985 that the Board fully understood that Allied wished to pursue its application. Shortly thereafter, the Board's engineer apprised Allied of the fact that the application was incomplete and that additional information was necessary. The missing information was supplied by Allied on December 12, 1985 and, as we have emphasized, its attorney in the accompanying letter stated his belief that the application was then complete. This was followed on December 17, 1985 by a letter from the Board's engineer certifying the application as complete. A meeting was then scheduled for January 23, 1986, and at the hearing Allied's application was formally denied.
In sum, there is no hint of bad faith, sharp practice, overreaching or dilatory conduct on the part of the Board. The record is totally devoid of any evidence of prevarication or obstructionism by the municipality. Rather, the course of events created by the parties bespeaks innocent inadvertence and misapprehension. Manalapan Holding Co. v. Hamilton Tp. Plan. Bd., supra, 92 N.J. at 481. The remedy of automatic *420 approval under the circumstances here would be disproportionately weighed against the public interest. See Precision Industrial Design Co. v. Beckwith, 185 N.J. Super. 9, 19 (App. Div. 1982), certif. den. 91 N.J. 545 (1982). While recognizing the beneficent public purpose sought to be achieved by the automatic approval mechanism, we are nevertheless of the view that it should not be used as a trap for the unwary.
We are thus satisfied that the appropriate disposition of this appeal is to require that Allied's application be considered by the Board forthwith. We so hold.
Accordingly, the judgment of the Law Division is reversed and the matter is remanded to the Board for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] The application was for a minor subdivision because it did not involve (1) a planned development, (2) any new street or (3) the extension of any off-tract improvement. See N.J.S.A. 40:55D-5.
[2] We thus emphasize that this is not a case in which the Board seeks "to equate deliberations with a vote...." See Sansone Olds.-Cad., Inc. v. Shrewsbury Bor., 211 N.J. Super. 304, 309 (Law Div. 1986). Here, the Board rendered its decision well within the 165-day time limitation required by the MLUL. See N.J.S.A. 55D-10.3 and N.J.S.A. 55D-61.
[3] However, N.J.S.A. 40:55D-47 provides, in pertinent part:

An ordinance requiring approval of subdivisions by the planning board may authorize the planning board to waive ... public hearing for an application for development if the planning board ... find[s] that the application for development conforms to the definition of "minor subdivision" in ... this act.
The Upper Saddle River Code, section 126-9E authorizes such waiver of a hearing. Although Allied's application also included a request for a variance, which, pursuant to N.J.S.A. 40:55D-70, requires a hearing, the absence of such hearing was a technical rather than substantive defect. See Precision Industrial Design Co. v. Beckwith, 185 N.J. Super. 9, 18 (App.Div. 1982), certif. den. 91 N.J. 545 (1982).
[4] The fact that the Board did not adopt a memorializing resolution immediately after the July 16th meeting is wholly irrelevant. By an amendment to the MLUL, effective February 1, 1980, the Legislature expressly provided that failure to adopt a resolution resulted in approval of the application. Lizak v. Faria, supra, 91 N.J. at 495. The most recent amendment to N.J.S.A. 40:55D-10g, effective July 1, 1984, deleted this section and replaced it with a requirement that any interested party may seek a court order compelling the agency to reduce its findings and conclusions to writing. Ibid. Since the meeting here took place after the effective date of the latest amendment, the Board's failure to adopt a timely resolution did not result in an automatic approval.