839 A.2d 78 (2004)
365 N.J. Super. 284
PARK CENTER AT ROUTE 35, INC., Plaintiff-Appellant,
v.
The ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF WOODBRIDGE, Defendant-Respondent, and
Dr. Norman Nepo and Gordon Berkow, Defendants/Intervenors; Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 2003.
Decided January 2, 2004.
*79 Stewart M. Hutt, Woodbridge, argued the cause for appellant (Hutt & Shimanowitz, attorneys; Mr. Hutt, of counsel and on the brief; Jonathan G. Burnham, on the brief).
Timothy M. Casey, Woodbridge, argued the cause for respondent Zoning Board of Adjustment of the Township of Woodbridge (Russo & Casey, attorneys; Mr. Casey, on the brief).
Gordon Berkow, respondent, argued the cause pro se.
Sodini & Spina, attorneys for respondent Dr. Norman Nepo (Patrick J. Spina, of counsel).
Before Judges SKILLMAN, WELLS and FISHER.
The opinion of the court was delivered by FISHER, J.A.D.
In Fieramosca v. Tp. of Barnegat, 335 N.J.Super. 526, 762 A.2d 1075 (Law Div. 2000), Judge Serpentelli considered the questionnot previously addressed by our courtswhether, in granting a land use application, a local agency is precluded from enforcing a condition if it failed to specifically include that condition in its memorializing resolution. We agree with Fieramosca that a local agency would not be so precluded and also conclude that the record in this case demonstrates that the Board intended to impose, even though not stated in its resolution, a condition for its approval. For that reason and in recognizing the absence of sufficient changed circumstances warranting a lifting of that condition, we affirm.
Plaintiff Park Center at Route 35, Inc. applied to the defendant Zoning Board of the Township of Woodbridge for a minor subdivision and various other approvals necessary for the creation of a strip shopping center. The application sought all the approvals necessary to construct a new shopping center building of nearly 10,000 square feet, together with a parking lot of seventy spaces. This parking lot was intended to serve the newly-constructed building and an existing medical building. According to the application, another structure, housing the "Park Sweet Shop," was to be demolished at some undefined point in the future, to provide for an additional six parking spaces.
Apparently because the "Park Sweet Shop" had been operating in this location for many years, Park Center proposed to the Board that its ultimate completion of the project occur in two phases. Phase I related to the construction of the strip shopping center building and the parking lot, as well as other aspects of the project. Phase II called for demolition of the sweet *80 shop building to provide for additional parking spaces for the other commercial enterprises at the site. Demolishing the sweet shop building also served the purpose of alleviating what Park Center described, in testimony offered in support of the application, as a very serious safety hazard. However, because the sweet shop operator had a long standing presence in the community,[1] Park Center proposed that Phase II not occur immediately, but rather await the end of the sweet shop operator's lease.
As a result, on January 22, 1998, the Board adopted a resolution which granted minor subdivision and site plan approval, as well as all necessary use and bulk variances for the project. The Board did not impose any requirement as to when Phase II would occur and did not describe Phase II as a condition for the granting of the approvals necessary for Phase I.
The sweet shop operator chose not to renew his lease sometime in 2001. However, rather than move on to Phase II as promised when the Board granted approval, Park Center obtained a new tenant to lease the building as a pizza restaurant. The zoning office cited Park Center for failing to comply with the site plan requirements and, as a result, Park Center sought an amended minor site plan approval.
The Board denied this application, because it viewed Phase II as a condition for its approval and because it found an inadequate basis for a finding of changed circumstances which might permit alleviation from the previously imposed condition. This denial caused Park Center to file a complaint in lieu of prerogative writs. After a bench trial, Judge Hurley also concluded that the completion of Phase II was a condition for approval of Phase I and, for that reason, the denial of the application for an amended site plan was not arbitrary and capricious. This appeal followed.
Our review of the judgment is no different from the trial judge's review of the Board's determinations. We are to presume that the Board acted fairly and will not attempt to determine whether its decision was "wise or unwise." Kaufmann v. Planning Bd. of Warren Tp., 110 N.J. 551, 558, 542 A.2d 457 (1988). Instead, "[b]ound by the same scope of review as the Law Division," we defer to the broad discretion of a local land use agency and "reverse only if we find its decision to be arbitrary, capricious, or unreasonable." Bressman v. Gash, 131 N.J. 517, 529, 621 A.2d 476 (1993).
In the matter at hand, the Board acted reasonably in both recognizing that it had conditioned approval upon the completion of Phase II and in refusing to amend its prior approval when Park Center sought to avoid its obligation to perform Phase II. The record created in the proceedings before the Board compels the conclusion that the approval of the initial application was conditioned upon the later completion of Phase II. In so holding, we recognize that while the memorializing resolution itself does not state this requirement as a condition, that fact alone is not determinative. As Judge Serpentelli correctly observed in Fieramosca, "the adoption of the memorializing resolution is not the `decision' but merely a memorialization of that decision." Fieramosca, supra, 335 N.J.Super. at 533, 762 A.2d 1075. Fieramosca correctly applied Sherman v. Harvey Cedars Bd. of Adj., 242 N.J.Super. 421, 430, 577 A.2d 170 (App.Div.1990), where it was held that "[w]hile the resolution *81 of the Board is certainly evidential on that issue, it is not determinative. The record is the best evidence of what the Board considered and decided." See also Allied Realty v. Upper Saddle River, 221 N.J.Super. 407, 415, 534 A.2d 1019 (App. Div.1987), certif. denied, 110 N.J. 304, 540 A.2d 1284 (1988); Orloski v. Bor. of Ship Bottom, 226 N.J.Super. 666, 678-79, 545 A.2d 261 (Law Div.1988), aff'd o.b., 234 N.J.Super. 1, 559 A.2d 1380 (App.Div. 1989). Accordingly, we agree with Judge Serpentelli's analysis in Fieramosca that the entire record before the local board must be considered to determine what was decided and whether a condition was imposed, notwithstanding the failure to include that condition in the memorializing resolution.
The record created on Park Center's application unmistakably demonstrates that approval for Phase I was conditioned upon the later completion of Phase II. In seeking approval, Park Center's application described its intentions with respect to the sweet shop structure in mandatory terms: "When all tenancies in said building terminate, said building will be demolished and Phase II will be implemented" (emphasis added). During the proceedings before the Board, Park Center also provided testimony as to the need to improve safety and enhance visibility in the area by removing the sweet shop structure. This testimony indicated in no uncertain terms the safety hazards which would be perpetuated by the continued existence of the sweet shop structure:
By eliminating in the future this existing Park Sweet Shop, it gives clear visibility, not only to our site but to the existing gas station for a safety factor. If you ever try to pull out of that Shell station coming alongside the existing Park Sweet Shop, you almost get killed trying to cross traffic. By eliminating that building ... there will be clear visibility right across the site ... and the safety factor will increase tremendously.
And the resolution itself, while not expressly describing the removal of the structure as a condition for the application's approval, does observe that "[t]he retail structure is proposed to be demolished and converted to six (6) parking spaces at a later date."
Phase II was a material aspect of the entire application and an integral component of the Board's overall approval of the application. This is epitomized by statements made by Board members on the application for an amendment, including:
Phase I was predicated upon Phase II somewhere down the road when the existing tenant's lease expired to be demolished. I know there's testimony to the fact that the demolition of that building would provide, amongst other things, not only parking, it was for safety purposes. That was testified to by the principal of the applicant.
...
I ... have read [the transcript of the initial application] front and back, five different people stressed that the Park Sweet Shop would come down under Phase II. And wherever I look, Phase II was an integral part of this project, and I don't see another interpretation of that standing.
...
I believe that the original application was as a whole and both parts of that application were Phase I and Phase II....
This understanding of the approval came as no surprise to Park Center whose application for amended site plan approval described the Board's earlier decision in the following way:

*82 The [prior] approval references Phase I development and Phase II development. Phase I ... is complete and occupied by retail tenants. Phase II contemplated the demolition of an existing building/business commonly referred to as the Park Sweet Shop. Applicant seeks Amended Minor Site Plan Approval to eliminate Phase II of the original approval and to allow the Park Sweet Shop structure to remain standing and to be utilized for a pizza/restaurant business.
[emphasis added.]
We conclude that the record of the proceedings before the Board demonstrates that the Board intendedand Park Center understoodthat the initial approval was conditioned upon the later completion of Phase II.
To obtain relief from such a condition, Park Center was required to apply again to the Board. Accordingly, we reject Park Center's contention that jurisdiction resided with some other local agency. Park Center was obligated to either perform Phase II or return to the Board to show there was a sufficient change in circumstances warranting a departure from the Board's earlier requirement that Phase II be completed. Russell v. Bd. of Adjustment of Tenafly, 31 N.J. 58, 66, 155 A.2d 83 (1959); Springsteel v. Town of West Orange, 149 N.J.Super. 107, 110, 373 A.2d 415 (App.Div.), certif. denied, 75 N.J. 10, 379 A.2d 241 (1977); Cohen v. Fair Lawn, 85 N.J.Super. 234, 237, 204 A.2d 375 (App. Div.1964). As we explained in Allied Realty, a local agency in similar circumstances may consider
a new application for a variance, or here for subdivision approval, or for modification or enlargement of one already granted, "or for lifting conditions previously imposed," upon a showing that the continued enforcement of the restriction would frustrate an appropriate purpose. Changed circumstances or other good cause may warrant reconsideration by the local authorities. To hold differently would offend public policy by countenancing a restraint upon the future exercise of municipal action in the absence of a sound reason justifying such a static approach. The question for the municipal agency on a second application thus centers about "whether there has occurred a sufficient change in the application itself or in the conditions surrounding the property to warrant entertainment" of the matter again.
[221 N.J.Super. at 414, 534 A.2d 1019 (citations omitted).]
In seeking to be released from its Phase II obligations, Park Center attempted to demonstrate that the visibility concerns discussed during the original application had been alleviated by other steps taken during Phase I. However, there was evidence before the Board that the visibility concerns in this area remained a safety concern.
Moreover, a review of the record demonstrates that Judge Hurley's summary of the amended site plan application and the Board's view of the motivating factor behind the application for an amendment was accuratethe application to amend was about economics and not about a sudden change in the safety concerns existing at the site. Park Center's president acknowledged that a mortgage was placed on the sweet shop structure conscious of the fact that Phase II required its demolition. In responding to questions from the Board, Park Center's president conceded that this self-imposed economic circumstance alone formed the basis for Park Center's desire to avoid performing Phase II:

*83 Q.... The whole purpose of this application, sir, is so you can pay that mortgage?
A. Absolutely.
Q. Okay. So your application before the board is based upon in large part, is it not, sir, economics? You want money from the rents don't you?
A. What else would it be based on?
Q. Obviously not the site access and the view, is it?
A. That has nothing to do with the reasons for me keeping the building up. I find that there's not a problem with that.
Even if such economic concerns, of personal interest only to the applicant, could constitute a changed circumstance sufficient to permit the lifting of a condition for approval in other situations, like Judge Hurley we agree that the Board's insistence upon the completion of Phase II was not arbitrary or capricious in the circumstances of this case.
Affirmed.
NOTES
[1] Park Center's president testified before the Board that the sweet shop operator "is in his 70s. I refuse to throw him out of the building. He has been there for eighteen years."