843 A.2d 1175 (2004)
367 N.J. Super. 527
Bruce and Rita GANDOLFI; Michael and Annette Donio; Mark and Rosemarie Rodio; Carmen and Josephine Bartalone; Frank and Loretta Bartalone; and Dennis and Cynthia Christopher, Plaintiffs-Respondents,
v.
TOWN OF HAMMONTON and Town of Hammonton Planning Board, Defendants, and
S.M.A. Land Developers, L.L.C., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 23, 2004.
Decided March 23, 2004.
*1177 Charles Lee Harp, Jr., Haddenfield, argued the cause for appellant (Archer & Greiner, attorneys; Mr. Harp, on the brief).
Rocco J. Tedesco, Vineland, argued the cause for respondents (Kavesh, Pancari, Tedesco & Pancari, attorneys; Mr. Tedesco, on the brief).
Before Judges HAVEY, PARRILLO and HOENS.
*1176 The opinion of the Court was delivered by HAVEY, P.J.A.D.
In this appeal, we revisit the question to what extent land-use litigation may be settled. Defendant Planning Board of the Town of Hammonton granted SMA Land Developers, LLC (SMA) a conditional-use approval for a twenty-nine lot cluster residential development on a twenty-four acre site. However, the Board denied SMA's application for a subdivision. SMA challenged the denial by an action in lieu of prerogative writs against the Board, and also sought damages against three individual Board members under 42 U.S.C.A. § 1983. In a separate action, plaintiffs challenged the grant of the conditional-use approval.
During the pendency of the SMA suit, the Board invited SMA's attorney to appear at a closed session of the Board to discuss settlement. As a result of the discussion, SMA's and the Board's attorney prepared a proposed consent order which provided for a remand to permit the Board to consider SMA's separate "byright" subdivision plan.[1] After the trial court refused to sign the consent order, SMA proceeded with its by-right application which was granted by the Board.
SMA now appeals from a judgment which invalidated the subdivision approval. In entering the judgment, the trial court held that the Board's closed-meeting settlement conference with SMA's attorney violated both the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21, and the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -136, and so tainted the subsequent Board proceedings that the approval could not stand. We reverse. Although the closed session with SMA's attorney may not have been permitted under the "pending litigation" exception to the OPMA, see N.J.S.A. 10:4-12b(7), no "action" on the proposed settlement agreement was taken during the meeting. See N.J.S.A. 10:4-15a. Further, considering *1178 the record of the subsequent Planning Board public hearings on the by-right application from an objective viewpoint, we conclude that those proceedings suffered no taint as a result of the settlement conference. Consequently, the Board's approval is sustained.

I
SMA is the contract purchaser of a twenty-four acre tract situate in the Town of Hammonton. The property is located in the Rural/Residential zone under the Town's Land Development Code, which permits cluster, residential development as a conditional use. In November 1999, SMA applied for conditional use and subdivision approvals for a twenty-nine lot residential, cluster development on its site. On June 7, 2000, the Board granted SMA's conditional use approval. However, on July 5, 2000, the Board denied the subdivision application by a three-to-three vote.
On August 31, 2000, plaintiffs filed an action in lieu of prerogative writs challenging the conditional-use approval. In turn, SMA filed a separate action challenging the denial of its subdivision application. The complaint also charged three Board members (defendants James Matro, Jr., Salvatore Colasurdo and Vincent Maione), who had voted to deny the application, with violating 42 U.S.C.A. § 1983 by "willfully, maliciously, [and] intentionally" disregarding SMA's property rights.
On October 26, 2000, plaintiffs' attorney wrote to the trial court advising of his intention to move at a later date to consolidate plaintiffs' and SMA's complaints. However, before any consolidation order was entered, SMA's attorney was invited to a closed meeting with the Board, its attorney and the attorneys representing the individual-member defendants, for the purpose of discussing settlement of SMA's action. The three Board members, who had been personally sued, attended the meeting.
During the meeting, the Board's attorney explained that two suits were pending and that one approach in resolving both actions was for SMA to abandon its conditional-use approval and to reapply for a "cookie-cutter" subdivision which would comply with Township ordinances without the necessity of variance approvals. The attorneys for both the Board and SMA stated that this approach would essentially moot plaintiffs' challenge to SMA's conditional-use approval, and give the developer the opportunity to proceed with its "byright" subdivision application.
SMA's attorney reminded the Board that it had already granted his client a conditional-use approval and stated that, because he was "very comfortable" with SMA's position as to the denial of its subdivision application, he would not hesitate to pursue his action. However, because litigation "takes time and money on everybody's part," SMA would consider settlement of the litigation. Referring to SMA's prior subdivision plan which had been rejected by the Board, he stated:
We had an absolute by-right before this Board one time already.... We're in Court litigating over that now. That's why we're going to win. It's a by-right and we're going to win.... But, I'm trying to avoid having to get to that process. We will give you an absolute no-variance, no-waiver, no de minimus exception plan that my client will build if he has to build, and you, as a matter of law, have to approve.
But we will only do it if it's in a controlled setting of a settlement. We're not going to do it through another six, eight, ten, eight whatever months of beating down these ridiculous hearings, when we've already done this already....

*1179 .... If we're going to wait that long, we'll litigate, and we'll win.
The attorneys suggested submitting a proposed consent order to the trial court staying the litigation pending a hearing on SMA's by-right plan.
Board members present at the meeting expressed concern that some members of the public would not even be amenable to a by-right subdivision. SMA's attorney responded that the record of the prior hearings could be marked and made part of the by-right hearings, and the public would have a full opportunity to comment on and object to the changes in the plans presented by SMA. The Board's attorney assured the Board that objecting parties "may come back and challenge [any approval] later on." He added:
I recommend giving a lot of latitude, because the public has a right to be heard. And these people, they live in the area. They'll want to come in and state their feelings. Whether they areI mean, they're not trained lawyers. They're coming in as common people and stating their feelings.
....
[Y]ou still have to have a public hearing on subdivisions, even if it's a by-right plan.
SMA's attorney explained that the by-right application would call for twenty-seven lots, rather than twenty-nine (the density approved as a conditional use), that the size and dimensions of the lots would comply with the Township's ordinances, and that the residential site improvements would adhere to governing standards.
The attorneys for the three individuallynamed defendants insisted that their clients not take a position on any possible settlement. As a result, one Board member observed that discussing settlement without participation by these members was a "moot point" because, without them, the Board had no quorum. When the Board discussed who could vote on the settlement proposal, one member reminded the others that: "[y]ou're not voting to approve the application." SMA's attorney also noted that the Board's "approval" was only an agreement to enter into a consent order prepared by the attorneys.
The Board did not act upon the settlement proposal during the November 1, 2000 meeting because of a lack of quorum of eligible members. However, several members expressed a desire to move "in resolving this" by settlement because of the undue expense to the Township in prolonging litigation. One Board member remarked:
Well, I would argue that the applicant has constitutional rights and is entitled to something. Okay? That we entertain a resolution of the litigation is for purposes beyond that. It's for trying to take away the litigation against these [individual Board] members personally. It's for trying to come to some resolution of this thing, which is not going to be adversely to ourto our taxpayers. My God, we can't spend a dollar to look at our ordinance, but we can spend zillions of dollars to litigate this thing.
At executive sessions held on November 8 and November 15, 2000, attended only by the Board members and their attorney, the settlement proposal was discussed. Site design and improvements regarding the future application were considered. One Board member stated, "[w]e're not going to allow [SMA] to get off the hook on terms of making sure that there's no off-siteadverse off-site impacts on drainage." He added that the Board, during any future application, must consider whether the layout was consistent with the zoning ordinance, and whether there is adequate drainage and enough storm-water management basins to resolve any offsite drainage problem. At the conclusion *1180 of the November 8 meeting, the Board voted, during the public segment of the meeting, in favor of a resolution directing its attorney:
to pursue a consent order which would provide for the abandonment of SMA[`s] conditional use approval on [its] proposed cluster application, abandon [its] pending claims against the planning board and its members in exchange for a consideration by the planning board for an expedited review process of a conventional bi-right (sic) subdivision of the proposed property without variances.
A form of consent order was prepared and signed by counsel providing for a stay of the SMA action pending a remand to the Planning Board:
for a hearing on an amended application for preliminary/final subdivision approval for the SMA property; and the parties having agreed that the Planning Board's review of the amended preliminary/final subdivision application pursuant to an expedited schedule will provide the opportunity for settlement of the within litigation and is preferable to the time and expense involved in pursuing this litigation....
....
The amended preliminary/final subdivision application to be submitted by SMA shall consist of the Town of Hammonton Planning Board Subdivision Application form and Subdivision Plans conforming with Hammonton Ordinance Section 175-67, and professional review escrow fees required by Hammonton Ordinances. All documents and reports submitted by SMA in connection with its prior cluster subdivision application shall be accepted by the Town of Hammonton Planning Board as part of the amended preliminary/final subdivision application. No additional documentation shall be required for a complete application.
The application will propose a conventional subdivision showing minimum lots of 22,000 square feet conforming with the bulk requirements of Hammonton Ordinance Section 175-150 and the Residential Site Improvement Standards, N.J.A.C. 5:21-1, et seq. The applicant shall not request any variances, but may request waivers, exceptions or de minimus exceptions (from the RSIS) as it deems appropriate.
The proposed order also provided that:
In the event that the amended preliminary/final subdivision application submitted by SMA is approved by the Town of Hammonton Planning Board with no conditions or with conditions acceptable to SMA, SMA shall file a Stipulation of Dismissal dismissing the pending action with prejudice. In this event, all approvals previously secured for the cluster conditional use shall be vacated.
In the event that the amended preliminary/final subdivision application submitted by SMA is not approved by the Town of Hammonton Planning Board or is approved with conditions deemed unacceptable by SMA, SMA shall so advise the Court and shall request a Case Management Conference at a date and time to be set by the Court.
On November 17, 2000, the proposed consent order was presented to the trial court in the presence of plaintiffs' attorney. The court refused to sign the order and directed counsel to confer in an attempt to settle the matter. The court's concern was:
If we have board members against whom compensatory and punitive damage claims are being dismissed, then sitting on a new application, certainly an interpretation could be placed on that that they are acting literally at the end of a gun and I have severe problems with that.
*1181 On December 1, 2000, the parties again appeared before the trial court, and again the court refused to sign the proposed order. Acknowledging that the three Board-member defendants would not vote on SMA's new application, the court nevertheless stated that "it certainly is putting all the other members of the planning board on notice that what happened to those three could happen to you." The trial court retained jurisdiction and stated that if SMA reapplied to the Board, it did so at its own risk. Again, the trial court suggested that the attorneys review all plans and studies in hopes of reaching a settlement.
On November 20, 2000, SMA filed its "by-right" application, and on December 6, 2000, SMA filed a partial stipulation of dismissal with prejudice in favor of the individual Board members. The subdivision application, along with SMA's other submissions were reviewed by professionals retained by plaintiffs. The professionals in turn submitted their comments to SMA's attorney, together with portions of their engineer's report.
SMA's application was considered by the Board during three public hearings, the first held on January 3, 2001. SMA's experts testified that the proposed layout complied with zoning, subdivision, and site improvement standards. SMA also presented testimony concerning compliance with the Township's Code governing the provision of recreational areas. Engineering testimony addressed the need for retention basins, impervious water flow and off-site drainage.
The Board's professionals reported on SMA's application and made recommendations concerning design changes. Its planner recommended that SMA's proposed recreational plan be referred to the Park Commission for consideration of a money contribution in lieu of constructing the onsite recreational facilities. The Board's engineer as well testified concerning on-and off-site conditions, compliance with site improvements standards, drainage and other engineering concerns.
Members of the Board questioned the Board's engineer and planner. They also made extensive remarks regarding SMA's submissions.
Plaintiffs' attorney cross-examined SMA's planner and engineer concerning the location and access to the proposed recreational facility, as well as problems of water run-off onto adjoining properties.
At the January 24, 2001 hearing, plaintiff Dennis Christopher, an adjacent property owner, testified that based on topographical factors, another location within the development was more suitable than SMA's proposed location for the recreational facilities. He also expressed concerns about the basin run-off overflows and the potential increase in drainage onto his property.
After summations by SMA's and plaintiffs' attorneys, the Board granted both preliminary and final subdivision approval with three design waivers and conditions by a six-to-zero vote. The Board members who were named as individual party-defendants in SMA's complaint did not vote on the application. The Board's decision, with conditions, was memorialized by a twelve-page resolution dated February 21, 2001. One condition provided that, in accordance with the Town's Development Ordinance, SMA pay a contribution to the Township in lieu of a recreational area, with the amount of the contribution to be fixed by the Town engineer. By subsequent resolution, the Board fixed the contribution figure at $111,000 in accordance with the engineer's estimate.
On April 4, 2001, plaintiffs amended their complaint. In the amended complaint they charge that during the November *1182 1, 2000 "secret meeting" between the Board and SMA's attorney, the Board "illegally agreed to approve" SMA's by-right subdivision, and agreed to approve the plan based on a limited record, within a limited period of time, and with limited input from the general public. They also claim that the Board had no jurisdiction to hear and decide the application because the Law Division had retained jurisdiction of the SMA action against the Board. They further contend that the Board's decision was arbitrary, capricious and unreasonable because the proposed plan did not comply with governing ordinance standards, including the Township Code respecting the provision of recreational facilities.
On May 4, 2001, SMA dismissed its complaint against the Board with prejudice. By case management order the trial court directed counsel to present trial briefs based on the expanded record.
In its written opinion dated October 3, 2002, the trial court first addressed plaintiffs' argument that the November 1, 2000 executive session violated the OPMA. Citing Whispering Woods v. Middletown Planning Board, 220 N.J.Super. 161, 170-74, 531 A.2d 770 (Law Div.1987), the court acknowledged that the Law Division had previously upheld the validity of such a private settlement conference under the "pending litigation" exception to the OPMA, N.J.S.A. 10:4-12b(7), which permits meetings of the public body to discuss litigation in which the public body is a party. Nevertheless, the trial court found that the public notice requirements of the MLUL, "must take precedent over the `litigation exception' of the [OPMA]." The court was troubled that the public was not barred from the November 1, 2000 meeting: "it was selectively barred," with SMA's attorney being present and other interested parties being excluded. This selective process, the court reasoned, violated both the OPMA and the MLUL:
It should be noted that this was not a case where the Planning Board's attorney met alone with the Board. The exception to the [OPMA] no doubt foresaw and intended the necessity of boards discussing with one another, gathered together for that purpose, and with their attorney, litigation in which they are involved. But to add to that meeting a developer's attorney, certainly converts it into a hearing in which the [MLUL] notice[] [requirements] are applicable, and which the [OPMA] itself intended to prevent.
The court concluded:
The decision subsequently reached by the Hammonton [Town] Planning Board was so tainted by this process that the approval reached by it of the subsequent application on January 24, 2002, was not based on reasons of public interest mandated by the Land Use Act, and was arbitrary, unreasonable and capricious. This subdivision approval is therefore reversed.
Nothing prevents the applicant from submitting a new application. As a result of this court's decision, no planning board members are disqualified by reason of having been named defendants in past litigation. So long as the three previously disqualified members (if indeed they are still Board members) participate in any such application as a result of this determination, there is no need to grant appellant's request that the court direct any such future application to be heard by a different planning board. If they do not sit, the application must be heard by a different board.

I
Citing Whispering Woods, supra, 220 N.J.Super. 161, 531 A.2d 770, SMA argues *1183 that the November 2000 closed session did not violate the OPMA. In Whispering Woods, the developer sued the Planning Board when it denied the developer's applications for conditional use, site-plan and subdivision approvals to build a 215unit residential complex and golf course. Id. at 163, 531 A.2d 770. During the pendency of the action the developer's attorney met with the Planning Board in closed session to discuss settlement by way of the developer submitting a revised plan to meet the concerns of the objectors. Id. at 165, 531 A.2d 770. At the meeting, a majority of the Board was inclined to vote in favor of the settlement as demonstrated by an "informal" poll. Ibid. The developer then submitted its revised plan at a public meeting after which the Board, by formal vote, approved both the settlement and the plan. Id. at 167-68, 531 A.2d 770. The Law Division held that the closed meeting was valid under the "pending litigation" exception to the OPMA. Id. at 174, 531 A.2d 770.
We need not express our agreement or disagreement with Whispering Woods' holding that the settlement conference was permitted under the OPMA, except to note that in addition to that portion of the "pending litigation" exception cited by the court in Whispering Woods, N.J.S.A. 10:4-12b(7) also provides for discussion in closed session of "[a]ny matters falling within the attorney-client privilege, to the extent that confidentiality is required in order for the attorney to exercise his ethical duties as a lawyer." Public bodies should be cautioned that the Supreme Court, since Whispering Woods was decided, has stated that:
We view N.J.S.A. 10:4-12b(7), relating to pending litigation and material covered by the attorney-client privilege, as duplicative of the protection otherwise afforded by the attorney-client privilege and work-product doctrine.

[Payton v. New Jersey Turnpike Auth., 148 N.J. 524, 558, 691 A.2d 321 (1997) (emphasis added).]
If the protection afforded by N.J.S.A. 10:4-12b(7) is "duplicative" of the protections afforded by the attorney-client and work-product privileges, the propriety of inviting the attorney representing the adverse party in pending litigation to participate in the closed meeting obviously may be in doubt.
In any event, N.J.S.A. 10:4-15a provides that "[a]ny action taken by a public body at a meeting which does not conform with the provisions of this act shall be voidable in a proceeding in lieu of prerogative writ[s]...." (Emphasis added). Here, no "action" was taken by the Board during the November 1, 2000 closed session. The transcript of the session makes clear that although a settlement proposal was discussed, it was never voted upon. In fact, there was no quorum of available and eligible Board members to take such action.
N.J.S.A. 10:4-15a provides further that when action taken by a public body does not conform to the provisions of the act, it "may take corrective or remedial action by acting de novo at a public meeting held in conformity with this act ...." This remedial section of the act "contemplate[s] maximum flexibility in rectifying governmental action which falls short of the standards of openness prescribed for the conduct of official business." Polillo v. Deane, 74 N.J. 562, 579, 379 A.2d 211 (1977). "While the purpose of the act is to secure public access to the meetings of public bodies, N.J.S.A. 10:4-15 `provide[s] a means to balance the rights of an informed citizenry against the need of government to function effectively.' " Council of NJ State College Locals v. Trenton State College Board of Trustees, 284 N.J.Super. 108, 115, 663 A.2d 664 (Law Div.1995) (quoting Aronowitz *1184 v. Planning Board, 257 N.J.Super. 347, 358-59, 608 A.2d 451 (Law Div.1992)).
Here, subsequent to the November 1, 2000 closed session, the Board and its attorney held executive sessions on two occasions to discuss the entry of a consent order for the purposes of settling the matter. At the public portion of the hearing held on November 15, 2000, a resolution was adopted authorizing the Board's attorney to "pursue" the consent order for the purpose of settling the SMA action. Thereafter, public hearings were held on SMA's by-right subdivision, which was the centerpiece of the settlement proposal. In our view, even if any "action" was taken during the November 1, 2000 meeting, the subsequent de novo actions taken during the public hearings cured any technical violation of the OPMA.

II
Aside from the question raised concerning the OPMA, the central issue in this case is, in the context of the public's right to notice and to be heard at a public hearing under the MLUL, see N.J.S.A. 40:55D-12, whether the Board's approval of SMA's by-right subdivision was so compromised by the settlement discussions during the November 1, 2000 meeting, that the application cannot stand. Stated differently, did the settlement discussions sufficiently infect the Board members' subsequent deliberative process during and after the by-right public hearings to render the Board's approval arbitrary, capricious and unreasonable.
Earlier cases, where litigation against municipal bodies was settled by "contract" between the developer and the municipality without public participation, uniformly resulted in the invalidation of the settlement. See V.F. Zahodiakin Eng'g Corp. v. Zoning Board of Adjustment, City of Summit, 8 N.J. 386, 394, 86 A.2d 127 (1952) (a municipality's exercise of its police power to serve the common good "may not be surrendered or curtailed by bargain... by the considerations which enter into the law of contracts"); Ench v. Mayor & Council of Township of Pequannock, 47 N.J. 535, 539, 222 A.2d 1 (1966) (if a municipality wishes to permit a land use forbidden by ordinance, it must do so by following the pertinent statutory procedures; it cannot short cut these procedures, by way of contract with the owner); Midtown Properties, Inc. v. Madison, 68 N.J.Super. 197, 206, 172 A.2d 40 (Law Div.1961) (contract between a developer and township settling challenge to the denial of a subdivision approval, incorporated into a consent order, was "on its face ... illegal and void" because it was an "attempt to do by contract what can only be done by following statutory procedure"), aff'd o.b., 78 N.J.Super. 471, 189 A.2d 226 (App.Div.1963); Edelstein v. City of Asbury Park, 51 N.J.Super. 368, 389, 143 A.2d 860 (App.Div.1958) (rescission of a sale of land by a city by consent order between the city's solicitor and purchaser during litigation is subject to challenge because "[t]o hold otherwise would be to insulate municipal acts from review, in derogation of the public interest ...").
Implicit in these holdings is not only the court's concern with the public body's surrender of its legal functions, but also the effect such "contracts" have on the public's right to be heard, particularly when such contracts are reached during the pendency of litigation. Warner Co. v. Sutton, 274 N.J.Super. 464, 473, 644 A.2d 656 (App.Div.1994). Once a prerogative writs action is initiated "it is believed that the public interest will be protected by the adversary process implicated in such a litigation." Dell'Aquila v. Board of Adjustment of Hoboken, 225 N.J.Super. 116, 123, 541 A.2d 1101 (App.Div.1988). Settlement of such litigation without compliance with *1185 statutory safeguards may at least raise the appearance "that the municipality, presumably protecting the public at large, may be bargaining away its legislative duties without public scrutiny or political accountability." Warner, supra, 274 N.J.Super. at 473, 644 A.2d 656.
However, the "contract zoning" cases should not be read as suggesting that landuse litigation may never be settled. In every case where settlement is a possibility, the court must reconcile competing interests: the public's right to notice and to be heard in the legislative or quasi-judicial proceeding of the public body, and our strong judicial policy favoring settlement of litigation. Ibid.
In Warner, the owner of a 3,000 acre tract of land in Maurice River Township, filed an action against the Planning Board and the Township challenging the rezoning of its property and approvals which limited its license to continue mining activity on the site, and which fixed density at one unit per twenty-five acres. Id. at 467-68, 644 A.2d 656. Warner and the Township defendants reached a tentative settlement which was memorialized in a consent order. Id. at 468, 644 A.2d 656. Under the agreement, Warner's mining nonconforming use status was recognized as to its entire tract; Warner was permitted "alternative uses," the location of which would be determined by Warner subject to Planning Board "adjust[ments]"; and a planned adult residential community was permitted consisting of up to 300 residential units. Id. at 469, 644 A.2d 656. The trial court signed the order without a hearing, and the Township's Zoning Map noted "that Warner's tract `may be subject to Court Order' which will `be available to the Planning Department.' " Id. at 469-70, 644 A.2d 656.
Discussions at subsequent hearings on the consent order and a revised order centered around the Township's potential liability if it did not settle, and the cost of litigation. Id. at 479, 644 A.2d 656. When various members of the public pressed their concerns respecting adverse environmental impact and other land-use factors, council members observed that "the agreement is a done deal" and "[n]ow, certain people want to become Monday night quarterbacks after the fact." Ibid. In setting aside the consent order, we held:
Because of the substantial changes in the present zoning standards envisioned by the settlement, zoning and planning principles and procedural safeguards devised by the MLUL are clearly implicated. To be "fair" the settlement must therefore be examined in the context of those principles and in accordance with those statutory procedures. Otherwise, the public will be shortchanged.
[Id. at 481-82, 644 A.2d 656.]
We recommended that, "[i]n reviewing the settlement proposal, the proper role of the Law Division judge should be to provide judicial oversight rather than to be a `super zoning legislature.' " Id. at 483, 644 A.2d 656. The judge must first determine whether any of the terms of the settlement are illegal or void as against public policy. Ibid. The matter should then be remanded to the governing body, with the trial court retaining jurisdiction, "for amendment to the Township's zoning ordinance for the purpose of implementing the settlement terms." Ibid. This procedure would provide for proper hearings to afford interested parties a familiar and convenient forum in which to express their views. Id. at 484, 644 A.2d 656.
Here, unlike Warner, there was hardly any wholesale rezoning by contract or judicial fiat. Indeed, no "contract" in which the Board agreed to approve SMA's byright application existed at all. At no time during both the closed and public meetings of the Board did its members agree to *1186 grant the by-right subdivision in return for SMA dismissing its action. In fact, the Board's resolution authorized its attorney to contact SMA's attorney:
to pursue a consent order which would provide for the abandonment of SMA[`s] conditional use approval on [its] proposed cluster application, abandon [its] pending claims against the planning board and its members in exchange for a consideration by the planning board for an expedited review process of a conventional bi-right [sic] subdivision of the proposed property without variances.
[Emphasis added.]
Moreover, by adopting the resolution, the Board did not bargain away or compromise its duty to enforce the Township's development standards to the detriment of the public good and general welfare. See Richard S. Cohen, Douglas K. Wolfson & Kathleen Meehan DalCortivo, Settling Land Use Litigation While Protecting the Public Interest: Whose Lawsuit Is It Anyway?, 23 Seton Hall L.Rev. 844, 848-49 (1993). For its part, the Board agreed only to "consider" a plan that complied with the subdivision and zoning ordinances and other governing standards.
The trial judge who refused to sign the proposed consent order was initially concerned with the inferential threat to the three individual defendant Board members, who would be "literally at the end of a gun" when they considered the by-right application. However, these Board members ultimately did not vote on the byright application. At a subsequent case management hearing, the judge acknowledged that the three Board member defendants would not vote on the application, but nevertheless refused to sign the proposed consent order because "it certainly is putting all the other members of the planning board on notice that what happened to those three could happen to you."
However, this observation is true with respect to every subdivision application. It certainly applies to the reapplication by SMA expected by the trial court as expressed in its judgment declaring the byright approval tainted and invalid. The judgment provides:
In the event of any future application for the development of this property, no Board Member shall be disqualified by reason of the prior applications or litigation arising therefrom.

IT IS FURTHER ORDERED that so long as the composition of the Board is not exactly the same as it was in January and February 2001, the Board is not disqualified from hearing any such future application for development. Such future application must be heard by a different Board only if (1) the composition of the Board is exactly the same as it was in January and February 2001 and (2) James Matro, Jr., Salvatore Colasurdo, and Vincent Maione, or any of them disqualifies himself from participating.

[Emphasis added.]
We read the judgment as permitting some Board members involved in the prior application, even the three Board member defendants, to sit on a future application by SMA to develop the property. We cannot accept the proposition that the subsequent Board, as constituted under the judgment, would be any less subject to "compulsion" to approve a future application than the Board members who granted the by-right approval.
Further, the record does not disclose any express or even implied threat of future actions against individual Board members who might consider the prospect of denying SMA's by-right application. To the contrary, the proposed consent order simply provided that, in the event the application is denied, SMA reserved the right *1187 to pursue its pending action against the Board and individual members for denying its original subdivision application.
Ultimately, the facts of this case must be examined in an objective manner to determine whether the settlement conference during the November 1, 2000 closed meeting tainted the subsequent public meetings and SMA's by-right approval. We begin that analysis with an acceptance of the proposition that it is presumed that planning board members act in good-faith and in an informed manner. In our view they did so in this case.
First, as noted, there was no agreement during the November 1, 2000 hearing to grant SMA its by-right subdivision application, nor was there deliberation by the Board of actual plans, density and layout. This fact distinguishes Stewart v. Planning Board of Township of Manalapan, 334 N.J.Super. 123, 131, 756 A.2d 1082 (Law Div.1999), relied on by plaintiffs, where the public body, at an informal meeting and without notice to the public, considered "issues of consequence" as to the details of a proposed subdivision.
Second, at the meeting, the Board's attorney indicated that, during public hearings on the by-right application, "a lot of latitude" must be given to the public concerning the new proposal. At subsequent executive sessions, where the Board's attorney discussed the proposed settlement at length with the Board, individual members expressed the view that SMA would not "get off the hook" in terms of adverse off-site drainage impacts, storm-water management basins and proper site layout. As noted, ultimately, the resolution adopted by the Board authorized the Board's attorney only to "pursue a consent order" providing for SMA's abandonment of its conditional use approval and dismissal of the complaint in exchange "for a consideration by the planning board" of an accelerated, by-right application. The Board members' comments, as well as the resolution itself, do not, in our view, objectively bespeak of a predisposition on the Board's part to grant the by-right approval.
Further, upon filing its application, SMA submitted the application and supporting documents to the professionals retained by plaintiffs for purposes of review. At the public hearings on the application SMA's engineer gave extensive testimony concerning the details of SMA's plan in the context of governing ordinances and siteimprovement standards. The Board's engineer as well considered the unique characteristics of the site and the need to control and channel storm-water runoff into retention basins. The Board's planner reported on SMA's proposed recreational facility. Members of the Board questioned its experts, and also made extensive remarks regarding drainage, grading and other site design and site-improvement factors. They also commented on the siting and accessibility of the proposed "tot lot" and other recreational facilities offered by SMA.
In addition, plaintiffs' attorney vigorously cross-examined the experts presented by SMA. He pressed SMA's planner regarding the location and accessibility to the recreational facility, and the number of children the facility will serve. He questioned SMA's engineer regarding lot grading, drainage patterns, existing problems of water flow onto adjacent properties, and the capacity of proposed drainage basins to alleviate the problem. After summations by SMA's and plaintiffs' attorneys, the Board granted both preliminary and final subdivision approvals with design waivers and conditions. A twelve-page, thorough resolution memorializing the approval was adopted by the Board.
We are entirely satisfied that the record establishes that the settlement discussions *1188 conducted during the November 1, 2000 closed session were of no consequence and did not taint the subsequent proceedings. SMA's by-right plan was subject to independent and exhaustive public scrutiny at duly noticed public meetings. In short, the public's right to be heard and to participate during the subdivision process was vindicated. Accordingly, the trial court erred in setting aside the by-right approval.

III
Plaintiffs argue that, aside from their claim that the by-right approval was tainted, the judgment invalidating the approval is sustainable on alternative grounds. First, citing Orloski v. Planning Board of Ship Bottom, 226 N.J.Super. 666, 545 A.2d 261 (Law Div.1988), aff'd, 234 N.J.Super. 1, 559 A.2d 1380 (App.Div.1989), they contend that the Board had no jurisdiction to hear the application because the trial court had retained jurisdiction of SMA's action against the Board.
Contrary to plaintiffs' argument, Orloski did not hold that the Board in that case lacked jurisdiction to act on a new subdivision plan submitted by the plaintiffs while their action against the Board was pending in the Law Division. Orloski involved the validity of a condition imposed by the Board of Adjustment on a prior approval which caused the denial of plaintiffs' subdivision application. Id. at 668-69, 545 A.2d 261. The jurisdictional issue was not before the court. It merely observed in a footnote that, while plaintiffs' action challenging the subdivision denial was pending in the Law Division, plaintiffs had filed a new subdivision application. The court stated:

Generally speaking, once an applicant has received a decision of the board and appealed in lieu of prerogative writs, the board is divested of jurisdiction absent a remand. In re Plainfield-Union Water Co., 14 N.J. 296, 302-03, 102 A.2d 1 (1954); Kramer v. Bd. of Adjust., Sea Girt, 80 N.J.Super. 454, 462-63, 194 A.2d 26 (Law Div.1963); aff'd on other grounds, 45 N.J. 268, 212 A.2d 153 (1965); Morton v. Mayor & Council of Tp. of Clark, 102 N.J.Super. 84, 98-99, 245 A.2d 377 (Law Div.1968), aff'd, 108 N.J.Super. 74, 260 A.2d 5 (App.Div. 1969); cf. Whispering Woods v. Middletown Tp., 220 N.J.Super. 161, 169-72, 531 A.2d 770 (Law Div.1987).
[Id. at 670 n. 1, 545 A.2d 261. (emphasis added).][2]
At least on the unique facts before us, we hold that the Board had jurisdiction to consider the by-right plan, despite the absence of a remand. The by-right subdivision was an entirely new application submitted to effect a settlement, the result of which would render moot plaintiffs' action challenging SMA's conditional-use permit, and cause dismissal of SMA's action against the Board and its individual members. The sound policy favoring settlement of litigation, to limit undue expense and to preserve judicial resources, was served by the by-right application. Also, the public's interest in being heard and participating in public hearings was respected. See Whispering Woods, supra, 220 N.J.Super. at 170, 531 A.2d 770 ("[n]o remand is required before the parties can explore settlement possibilities in a litigated case so long as the public interest is not disserved thereby").
*1189 Plaintiffs further contend that the by-right application is invalid because no "fairness" hearing was conducted. As noted, in Warner, supra, we held that in reviewing a settlement proposal in landuse litigation, the court should make the threshold finding as to whether any of the settlement terms are illegal or void against public policy. 274 N.J.Super. at 483, 644 A.2d 656 (citing Cohen, Wolfson & Meehan DalCortivo, supra, 23 Seton Hall L.Rev. at 864). However, in this case, no fairness hearing was conducted because the trial judge refused to consider the terms of the proposed consent order at all because of the perceived threat by SMA inherent in its terms. In any event, the absence of a fairness hearing in this case is of no consequence since, on its face, the by-right plan, calling for compliance with all governing standards, cannot be deemed illegal or void against public policy.

IV
Plaintiffs also challenge the grant of the by-right subdivision approval on the merits, despite the fact that the trial court did not decide that issue. Ordinarily, we would remand for findings by the trial court on the issue in the first instance. However, since it has been nearly five years since the inception of this dispute, we exercise original jurisdiction, see Rule 2:10-5, and find that the Board's approval of the by-right subdivision is sustainable.
Plaintiffs first argue that the approval resulted in an impermissible increase in density. The argument is premised on the untenable assumption that, under the Township's ordinance, when a developer makes a contribution in lieu of constructing a recreational facility, it still must preserve the area initially earmarked for the facility. No reasonable interpretation of the governing ordinance supports such a conclusion. Section 195-9 of the Town's Development Ordinance permits the applicant "to substitute the provisions of open space and recreation by providing a payment in lieu of satisfying these requirements to a reserve for open space and recreation...." (Emphasis added). The double counting urged by plaintiffs is not supported by either the clear language or spirit of the "in lieu" provision.
Nor do we find persuasive plaintiffs' argument that the Board was arbitrary in accepting the $111,000 contribution in lieu of construction of the recreational facilities. It is well settled that a court may not "substitute its judgment for that of a board `even when it is doubtful about the wisdom of the action.' " Cell So. of New Jersey v. Zoning Board of Adjustment, 172 N.J. 75, 81, 796 A.2d 247 (2002) (quoting Cellular Tel. Co. v. Zoning Bd. of Adjustment, 90 F.Supp.2d 557, 563 (D.N.J.2000)). Courts will defer to the board's decision "if it is supported by the record and is not so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion." Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327, 704 A.2d 1271 (1998). We find no abuse of discretion here.
The Board made the in lieu decision only after referring the matter to the Park Commission to consider the merits of a contribution to meet the recreational needs of the entire town, rather than constructing a facility that will service only twenty-seven homes. The Board's decision was also supported by its planner's recommendation that the in lieu payment be accepted because: (1) a recreational facility may not be used by a subdivision the size of SMA's plan; (2) there is the potential that the Town may have to assume the cost of maintaining and insuring the facility in future years; and (3) adequate nearby facilities were available. We *1190 defer, as we must, to the Board's exercise of discretion on this point.

V
Plaintiffs advance the additional argument that:
The determination of the board to accept the sum of one hundred eleven thousand dollars as the developer's contribution in lieu of active recreational requirements was not based on adequate evidence and accordingly was arbitrary, unreasonable and capricious. Further, the determination of the board to accept that sum was not made at a public hearing on notices required by law and accordingly is void and of no force and effect and violative of the Gandolfi plaintiffs' due process rights.
We have considered this contention and supporting argument and are satisfied the issue is not of sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
Reversed.
NOTES
[1] During the settlement discussions, the attorney for the Board characterized the plan as a "by-right" subdivision because it was expected that the plan would comply with all governing ordinance standards and would not require variances. See Pizzo Mantin Group v. Township of Randolph, 137 N.J. 216, 645 A.2d 89 (1994).
[2] In Whispering Woods, supra, 220 N.J.Super. at 169-170, 531 A.2d 770, the court readily distinguished Kramer v. Board of Adjustment, Sea Girt, 80 N.J.Super. 454, 194 A.2d 26 (Law Div.1963) and Morton v. Mayor & Council of Township of Clark, 102 N.J.Super. 84, 245 A.2d 377 (Law Div.1968), aff'd, 108 N.J.Super. 74, 260 A.2d 5 (App.Div.1969).