849 A.2d 1117

FALLONE PROPERTIES, L.L.C., PLAINTIFF–RESPON-DENT/CROSS–APPELLANT, v. BETHLEHEM TOWNSHIP PLANNING BOARD, DEFENDANT–APPELLANT/CROSS–RE-SPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted May 3, 2004—Decided June 11, 2004.

Before Judges NEWMAN, FALL and PARRILLO.

*Woolson, Sutphen, Anderson & Nergaard,* attorneys for defendant-appellant/cross-respondent (*William R. Sutphen, III,* on the brief).

*William R. Connolly,* attorney for plaintiff-respondent/cross-appellant.

The opinion of the court was delivered by

PARRILLO, J.A.D.

This is an action in lieu of prerogative writs. Defendant Bethlehem Township Planning Board (Board) appeals from a judgment

of the Law Division reversing its denial of plaintiff Fallone Properties, L.L.C.'s (Fallone) application for major subdivision approval as arbitrary and unreasonable and on the basis that the Board's decision was made in executive session, in violation of the Open Public Meeting Act, *N.J.S.A.* 10:4–6 to –21 (OPMA). Plaintiff cross-appeals from the Law Division's denial of its application for automatic statutory preliminary approval.

The salient facts are as follows. On March 16, 2000, Fallone, the contract purchaser of a 115–acre parcel in Bethlehem Township, then used for farming, submitted an application for preliminary major cluster subdivision approval. The plan called for the property, to be known as Field Hollow, to be divided into twenty-six residential lots. Twenty-two of the lots were to be approximately 1.5 acres in size; two lots, approximately 2.5 to 2.8 acres in size; and one lot, approximately 7.386 acres in size. The remaining lot was to be approximately 66.73 acres in size, upon which would be located a dwelling, a detention basin and undeveloped open space.

The parcel comprising the Field Hollow development was located in the mountain residential (MR) district or zone, for which Bethlehem Township had recently established new zoning regulations. In 1999, after review and analysis of hydrogeologic and planning studies submitted by Bethlehem Township's experts, the Township Code was amended to require a minimum lot size of five acres. The Township Code, however, allows cluster developments on parcels of twenty-five acres or more in the MR district pursuant to the Cluster Ordinance, § 102–13.1. In such cases, the Cluster Ordinance permits a minimum lot size of 1.5 acres provided that 70% of a development tract remains open space. In other words, the Cluster Ordinance, the goals of which are set forth in Section 102–13.1A, relaxed the minimum lot size but required larger open space reservation.

Thus, the Cluster Ordinance required that 80.6 acres of plaintiff's 115–acre tract remain open space. To satisfy this requirement, plaintiff proposed creating an open space lot of 63.157

acres[1], which would have comprised 54.8% of the tract area, and making up the resulting 15% shortfall by placing conservation easements on the rear of the residential lots. The proposal essentially involved an overlap of open space and usable portions of residential lots within the building envelopes, and would place more than one-half of many of the residential lots in conservation easements. Also, by placing them in the rear of the lots, the conservation easements would be located in areas that could include septic fields as well as usable yard enjoyment space. Notably, the site is already significantly constrained by wetland areas located in the southern, western and eastern border of the tract. Many of the proposed lots contain wetlands and/or surface waters, and the New Jersey Department of Environmental Protection (DEP) has or is expected to require a 150-foot transition area buffer for these wetland areas. The building envelopes on two of the residential lots are proposed to be located substantially in the buffer area. The application requires a wetlands averaging plan for three of the lots, and a permit to cross wetlands at the entrance.

At the hearing on plaintiff's application[2], the Board suggested, alternatively, that if three lots were eliminated as building lots and added to the open space, plaintiff's application would be within approximately 2% to 3% of complying with the 70% open space

---

[1] As noted, plaintiff's cluster plan described a large 66.73 acre lot upon which certain structures and other encumbrances would be placed. We assume that the smaller 63.157 acre figure used by the Board in calculating the total open space percentage in plaintiff's plan, a figure undisputed by plaintiff, represents that portion of the lot in question not subject to development.

[2] Prior to the filing of its Field Hollow application, plaintiff filed a lawsuit against Bethlehem Township challenging the validity of Ordinance No. 255–23–99—which would later become the Cluster Ordinance. *Fallone Properties, L.L.C. v. Township of Bethlehem and Bethlehem Township Planning Board*, Docket No.: HNT–L–310–79 (the Ordinance Case). During the pendency of the Field Hollow application, the Ordinance Case remained in litigation. Trial was scheduled to take place on June 18, 2001, but on that date, plaintiff voluntarily dismissed the case without prejudice.

requirement. The remaining de minimis percentage could then be satisfied by placing conservation easements at the rear of the lots. In that case, the depth of such easements would be less than one-half of the required rear yard set back. Plaintiff, however, declined to modify its application to reduce the number of residential lots originally proposed. Its proposal remained that 24.23 acres of the 115.75 acres would be subject to construction activity, and 82.953 acres, including land depicted as conservation easements, would be set aside as open space, yielding a total of 72% open space.

The Board voted to deny preliminary approval of plaintiff's application. The Board interpreted the Cluster Ordinance, Section 102–13.1C, as requiring a single lot set-aside of 70% open space and the remaining 30% of the tract to be divided into lots meeting the area and yard requirements of the Code. Plaintiff's application fell short of this requirement, proposing lots in excess of the number of lots permitted under the cluster provision and of a density exceeding that allowed under the Code, requiring, in the Board's view, a variance pursuant to *N.J.S.A.* 40:55D–70(d)(5). Moreover, eight of the proposed lots would be severely constrained by wetlands and/or wetlands transition areas located on the lots, leaving very little usable area within the building envelope. In addition, the Board determined that certain bulk variances were required to resolve minimum lot frontage and maximum width issues. Thus, the Board concluded that plaintiff's application, as proposed, did not conform to the Township's zoning ordinance and that approving it would impair the intent and purpose of the zone plan and master plan.

On June 21, 2001, plaintiff filed a complaint in lieu of prerogative writs in the Law Division, challenging the Board's denial of its cluster plan application and asserting that, in any event, it was entitled to automatic statutory preliminary approval under *N.J.S.A.* 40:55D–48(c) because of the Board's delay in acting on its application. The trial court disagreed with the Board's interpretation of the Cluster Ordinance and held that the provision could be

interpreted to allow plaintiff to satisfy any shortfall from the 70% open space requirement by the use of conservation easements on other lots. Accordingly, the trial court held that the Board's rejection of plaintiff's application was arbitrary and capricious, reversed the Board's denial of plaintiff's application, and remanded the matter to the Board. As an additional basis for reversal, the court ruled that the Board reached its decision to reject plaintiff's application in executive session, in violation of the OPMA. Finally, the court rejected plaintiff's argument that its plan was entitled to automatic statutory approval because plaintiff failed to demonstrate that the Board's inaction was the type of intentional or undue delay the statute was designed to remedy.

On appeal, the Board contends:

I. THE TRIAL COURT ERRED IN CONCLUDING THAT THE BETHLE-HEM TOWNSHIP PLANNING BOARD MADE ITS DETERMINATION IN EXECUTIVE SESSION.

II. THE TRIAL COURT ERRED IN FINDING THAT THE ACTION OF THE BETHLEHEM TOWNSHIP PLANNING BOARD IN DENYING FALLONE'S APPLICATION WAS ARBITRARY, CAPRICIOUS AND UN-REASONABLE.

On cross-appeal, plaintiff argues:

I. THE TRIAL COURT ERRED IN DENYING FALLONE'S CLAIM FOR STATUTORY PRELIMINARY APPROVAL UNDER *N.J.S.A.* 40:55D-48.

■■■ It is well established that when a reviewing court is considering an appeal from an action taken by a planning board, the standard employed is whether the grant or denial was arbitrary, capricious or unreasonable. *See Burbridge v. Mine Hill Tp.,* 117 *N.J.* 376, 385, 568 *A.2d* 527, 532 (1990); *Kramer v. Bd. of Adjustment, Sea Girt,* 45 *N.J.* 268, 296, 212 *A.2d* 153, 169 (1965); *Med. Ctr. v. Princeton Zoning Bd. of Adjustment,* 343 *N.J.Super.* 177, 198, 778 *A.2d* 482, 495 (App.Div.2001). The factual determinations of the planning board are presumed to be valid and the exercise of its discretionary authority based on such determinations will not be overturned unless arbitrary, capricious or unreasonable. *Burbridge, supra,* 117 *N.J.* at 385, 568 *A.2d* 527, 532; *Rowatti v. Gonchar,* 101 *N.J.* 46, 51–52, 500 *A.2d* 381, 384–85 (1985). "[T]he law presumes that boards of adjustment and

municipal governing bodies will act fairly and with proper motives and for valid reasons." *Kramer, supra,* 45 *N.J.* at 296, 212 *A.*2d at 169.

The purpose of judicial review is for the court to determine whether or not the board acted within the statutory guidelines and properly exercised its discretion. *Burbridge, supra,* 117 *N.J.* at 384–85, 568 *A.*2d at 532. The reviewing court is not permitted to substitute its judgment for that of the board's. *Kaufmann v. Planning Bd. for Warren Township,* 110 *N.J.* 551, 558, 542 *A.*2d 457, 460 (1988). A reviewing court is not to "suggest a decision that may be better than the one made by the board of adjustment or planning board, but to determine whether the board could reasonably have reached its decision." *Davis Enters. v. Karpf,* 105 *N.J.* 476, 485, 523 *A.*2d 137, 141 (1987).

To be sure, a court is not bound by an agency's determination on a question of law, *In re Distrib. of Liquid Assets,* 168 *N.J.* 1, 11, 773 *A.*2d 6, 12 (2001), and the court's construction of an ordinance under review is *de novo. DePetro v. Township of Wayne Planning Bd.,* 367 *N.J.Super.* 161, 174, 842 *A.*2d 266, 275 (2004). Nevertheless, we "give deference to a municipality's informal interpretation of its ordinances." *Ibid. See also Wyzykowski v. Rizas,* 254 *N.J.Super.* 28, 38, 603 *A.*2d 53, 59 (App.Div.1992), *aff'd in part, rev'd in part,* 132 *N.J.* 509, 626 *A.*2d 406 (1993). Thus, planning boards are granted "wide latitude in the exercise of the delegated discretion" due to their "peculiar knowledge of local conditions." *Burbridge, supra,* 117 *N.J.* at 385, 568 *A.*2d at 532 (quoting *Kramer, supra,* 45 *N.J.* at 296, 212 *A.*2d at 169). Indeed, local officials are "thoroughly familiar with their communities' characteristics and interests" and are best suited to make judgments concerning local zoning regulations. *Pullen v. Township of South Plainfield,* 291 *N.J.Super.* 1, 6, 676 *A.*2d 1095, 1097 (App.Div.1996) (citing *Ward v. Scott,* 16 *N.J.* 16, 23, 105 *A.*2d 851, 855 (1954); *Bellington v. Township of East Windsor,* 32 *N.J.Super.* 243, 249, 108 *A.*2d 179, 182 (App.Div.1954), *aff'd,* 17 *N.J.* 558, 112 *A.*2d 268 (1955)).

 Likewise, when reviewing the decision of a trial court that has reviewed municipal action, we are bound by the same standards as was the trial court. *Fred McDowell, Inc. v. Bd. of Adjustment of Township of Wall*, 334 *N.J.Super.* 201, 212, 757 *A.2d* 822, 828 (App.Div.2000), *certif. denied*, 167 *N.J.* 88, 769 *A.2d* 1051 (2001); *Charlie Brown of Chatham, Inc. v. Bd. of Adjustment of Township of Chatham*, 202 *N.J.Super.* 312, 321, 495 *A.2d* 119, 123 (App.Div.1985). Thus, while we will give substantial deference to findings of fact, it is essential that the board's actions be grounded in evidence in the record. *E.g., Tomko v. Vissers*, 21 *N.J.* 226, 239–240, 121 *A.2d* 502, 509–10 (1956). *Cf. Smith v. Fair Haven Zoning Bd. of Adjustment*, 335 *N.J.Super.* 111, 120, 761 *A.2d* 111, 116 (App.Div.2000). By the same token, although we construe the governing ordinance *de novo*, we recognize the board's knowledge of local circumstances and accord deference to its interpretation. *Somers Assoc. v. Gloucester Township*, 241 *N.J.Super.* 323, 342–43, 575 *A.2d* 20, 30–31 (App.Div.), *certif. denied*, 122 *N.J.* 355, 585 *A.2d* 366 (1990).

I

 With these standards in mind, we consider the Board's rejection of plaintiff's preliminary cluster subdivision application as not in conformity with relevant provisions of Bethlehem Township's zoning code. For reasons that follow, we find the Board's construction of the Cluster Ordinance to preclude the use of conservation easements to make up a significant shortfall from the 70% open space requirement entirely reasonable and consistent with the overall goals of the zone plan.

The Cluster Ordinance expressly provides that the maximum number of lots permitted is to be determined by first establishing the requisite 70% open space. Indeed, section 102–13.1C of the Cluster Ordinance provides in relevant part:

> Procedure to determine density. The maximum number of lots permitted under the clustering zoning shall be determined by establishing the required 70% open space with lots meeting the yard area requirements of Section 102–13G of this section.

Moreover, Section 102–13.1E of the Cluster Ordinance specifies that in designing a plan, an applicant should first set aside 70% open space and use the remaining 30% of the space to determine house sites. The precise manner of formulating a conceptual plan is thus set forth in Section 102–13.1E:

> Design process and criteria. Each conceptual plan shall follow a four-step design process, as described below. When the conceptual plan is submitted, applicants shall be prepared to demonstrate to the Planning Board that these four design steps were followed by their site designers in determining the layout of their proposed streets, house lots and greenway lands.
>
> (1) Designating the open space. During the first step, all potential open space areas are identified.
>
> (2) Location of house sites. During the second step, potential house sites are tentatively located . .

Read together, these sections support the Board's interpretation of the Cluster Ordinance to require a 70% set-aside on a single, self-contained lot. As clearly required by the Cluster Ordinance, the first step of the design process is to designate the 70% open space and then determine the number of permitted residential lots by use of the 30% balance of the acreage, where it is reasonable to assume the house sites are to be located.

Moreover, the Board's interpretation is consistent with the overall goals of "cluster development" in general, of New Jersey's Municipal Land Use Law, *N.J.S.A.* 40D:55D–1 to –136 (MLUL), *see e.g., N.J.S.A.* 40:55D–2; *N.J.S.A.* 40:55D–5; and of the Bethlehem Township zone plan in particular. As to the former, "[t]he essence of 'cluster development' is that it permits smaller lots than otherwise required for the zone provided that there is no increase in the number of lots which would be permitted under a conventional subdivision, with the remaining land area being held in common by the lot owners as open space for recreational or conservation purposes in accordance with the standards of *N.J.S.A.* 40:55D–43." Cox, *New Jersey Zoning & Land Use Administration,* (Gann 2003) at 371. *N.J.S.A.* 40:55D–43(a) states that:

> an Ordinance pursuant to this article providing for planned unit development, planned unit residential development, or residential cluster shall require that the

developer provide for an organization for the ownership and maintenance of any open space for the benefit of owners or residents of the development, if said open space is not dedicated to the municipality or other governmental agency.

Clearly then, the very essence of cluster development would be defeated by allowing, as plaintiff suggests, open space to be located on individual residential lots.

Plaintiff's interpretation would also contravene the specific purposes of Bethlehem Township's clustering arrangement as expressly set forth in Section 102–13.1A of the Municipal Cluster Ordinance:

(1) Lower per lot cost for streets and utilities.

(2) Reduce the total length of streets and utilities to reduce maintenance costs.

(3) Encourage the separation of vehicular and pedestrian traffic.

(4) Include possible recreation facilities near residents.

(5) Preserve the natural ecological features.

(6) Establish parklands, greenways, trails, and/or recreational facilities to benefit the Municipality and the County.

(7) Permit the continuation of existing agricultural use.

In addition, the evaluation criteria to be considered when reviewing a cluster design layout are set forth in Section 102.131D and include:

(1) Protect critical areas (wetlands, floodplains, steep slopes).

(2) Preserve and maintain mature woodlands, existing fields, pastures, meadows, and orchards, and create buffers to minimize conflicts between residential and agricultural uses.

. . . .

(12) Provide residents and nearby house lots convenient assess to recreational areas.

(13) Create a pedestrian circulation system that permits access to unique tract features, open space, and/or open space of adjoining parcels.

(14) Provide open space that is reasonably contiguous and not broken into small tracts of land dispersed about the site. When possible, open space shall abut existing or potential open space land on adjacent parcels.

In our view, many of the purposes set out in Section 102–13.1A, and several of the evaluation criteria set out in Section 102–13.1D, which envision the use of open space not only by residents of the particular development, but all citizens of Bethlehem Township, could not be satisfied if open space were permitted to be on

conservation easements located on independently owned residential lots.

Plaintiff nevertheless argues, and the trial court agreed, that the Board's past practice of allowing other applicants to make up shortfalls from the 70% open space requirement through the use of conservation easements undermines the Board's position that the Cluster Ordinance requires the location of the entire 70% open space on one lot. We disagree. Prior departures from the general rule have involved only minimal amounts of land, typically falling within 2% to 3% percent of satisfying the open space requirement. Such de minimis shortfalls, in our view, may be remedied through the use of conservation easements without contravening the spirit and intent of the Cluster Ordinance. In contrast, larger departures, such as the 15% shortfall presented by plaintiff's application, cannot be similarly remedied without substantially undermining the underlying goals and intent of the Cluster Ordinance.

Moreover, in past instances in which the Board has allowed the use of conservation easements to make up for a minor deficiency in the 70% open space requirement, it has consistently required a variance application and allowed the departure only pursuant to that variance. Of course, it is within a planning board's inherent powers to grant a variance from a zoning rule when considering a development application. *See Urban v. Planning Bd. of Manasquan,* 238 *N.J.Super.* 105, 117, 569 *A.2d* 275, 280–81 (App.Div.1990), *aff'd as modified,* 124 *N.J.* 651, 592 *A.2d* 240 (1991). Here, despite notice that a variance would be required in order to supplement its open space shortfall through conservation easements, plaintiff chose not to request such a variance. We conclude that the Board's subsequent determination that plaintiff's application did not satisfy the Cluster Ordinance was reasonable.

## II

We also reject the trial court's determination that the Board's decision on the merits of plaintiff's application is void as

having been reached in executive session, in violation of the OPMA.

*N.J.S.A.* 10:4–7 provides in relevant part:

The Legislature finds and declares that the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process; that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society, and hereby declares it to be the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way. . . .

The Act's remedial mechanism, *N.J.S.A.* 10:4–15(a), provides that "[a]ny action taken by a public body at a meeting which does not conform with the provisions of this act shall be voidable in a proceeding in lieu of prerogative writ[s]. . . ." *See Gandolfi v. Town of Hammonton*, 367 *N.J.Super.* 527, 539–40, 843 *A.*2d 1175, 1183 (App.Div.2004).

 Our Supreme Court "has made it absolutely plain that the prescribed provisions of the [OPMA] require strict and literal compliance and may not be satisfied by substantial compliance." *Precision Indus. Design Co. v. Beckwith*, 185 *N.J.Super.* 9, 14, 447 *A.*2d 186, 189 (App.Div.), *certif. denied*, 91 *N.J.* 545, 453 *A.*2d 863 (1982) (citing *Polillo v. Deane*, 74 *N.J.* 562, 379 *A.*2d 211 (1977)). Willful violations of the Act require swift and strong remediation. *Liebeskind v. Mayor and Mun. Council of Bayonne*, 265 *N.J.Super.* 389, 394, 627 *A.*2d 677, 679 (App.Div.1993). However, invalidation of public action is an extreme remedy which should be reserved for violations of the basic purposes underlying the Act. *Ibid. See also AQN Assocs., Inc. v. Township of Florence*, 248 *N.J.Super.* 597, 614–15, 591 *A.*2d 995, 1004 (App.Div.), *certif. denied*, 126 *N.J.* 385, 599 *A.*2d 162, (1991).

The OPMA contains a number of enumerated exceptions to its general requirements. Among them is a "pending litigation" exception. *N.J.S.A.* 10:4–12(b)7. The pending litigation exception empowers a public body to exclude the public from all or a portion of a meeting where the public body discusses "[a]ny pending or

anticipated litigation or contract negotiation other than in subsection b.(4) herein in which the public body is, or may become a party." *Ibid.* Previously, our Supreme Court has considered the scope of the exception:

> We view *N.J.S.A.* 10:4–12(b)(7), relating to pending litigation and material covered by the attorney-client privilege, as duplicative of the protection otherwise afforded by the attorney-client privilege and work-product doctrine. If a communication is covered by the privilege, then the public body legitimately may meet with its attorney in closed session.

> [*Payton v. New Jersey Tpk. Auth.,* 148 *N.J.* 524, 559, 691 *A.*2d 321, 338 (1997).]

In this case, at the time the Board was considering plaintiff's application, it was also in negotiations with plaintiff to settle pending litigation (the Ordinance Case) involving another of plaintiff's development plans. After a full public hearing on the merits of plaintiff's instant application, the Board went into executive session in order to consider the Ordinance Case litigation, to which it was a party, and its relationship to the pending application, but not the merits of the application itself. When the Board returned from executive session it voted on plaintiff's application and rejected it.

As the record demonstrates, public hearings on the merits of plaintiff's cluster plan application were held over the course of two days. During those hearings, testimony was taken and exhibits were introduced into evidence. The Board fully considered the merits of that application in open session before adjourning to executive session when the matter of the Ordinance Case litigation arose, to privately discuss the pending litigation to which it was a party. This procedure is clearly allowed by the "pending litigation" exception of *N.J.S.A.* 10:4–12(b)7. On this score, there is no indication that any "action" on the instant application was taken by the Board during its February 12, 2001 executive session. On the contrary, the Board's subsequent Resolution No. 2cc1–1 outlined in detail its reasons for rejecting plaintiff's application. We find no violation of the OPMA in this instance and accordingly reverse the Law Division's holding to the contrary.

## III

We do agree, however, with the trial court's determination that plaintiff's application did not merit automatic statutory approval pursuant to *N.J.S.A.* 40:55D–48(c), because there was no intentional or undue delay by the Board. Accordingly, we affirm that portion of the trial court's decision, which is the subject of plaintiff's cross appeal.

*N.J.S.A.* 40:55D–48(c) provides in relevant part:

Upon the submission of a completed application for a subdivision of more than 10 lots, the planning board shall grant or deny preliminary approval within 95 days of the date of such submission or within such further time as may be consented to by the developer. Otherwise, the planning board shall be deemed to have granted preliminary approval to the subdivision.

Moreover, *N.J.S.A.* 40:55D–10.3 informs as to when an application may be properly considered complete in the event of agency inaction:

An application for development shall be complete for purposes of commencing the applicable time period for action by a municipal agency, when so certified by the municipal agency or its authorized committee or designee. In the event that the agency, committee or designee does not certify the application to be complete within 45 days of the date of its submission, the application shall be deemed complete upon the expiration of the 45–day period for purposes of commencing the applicable time period, *unless: a. the application lacks information indicated on a checklist adopted by ordinance and provided to the applicant; and b. the municipal agency or its authorized committee or designee has notified the applicant, in writing, of the deficiencies in the application within 45 days of submission of the application....*

[Emphasis added.]

It is clear that automatic approval statutes are to be "applied with caution." *King v. New Jersey Racing Comm'n,* 103 *N.J.* 412, 422, 511 *A.*2d 615, 621 (1986); *Eastampton Center, LLC v. Planning Bd. of Township of Eastampton,* 354 *N.J.Super.* 171, 193, 805 *A.*2d 456, 470 (App.Div.2002). "[A]pplication of the statutory time constraints must be anchored in the reason for their existence. The evil which the automatic approval provisions were designed to remedy was municipal inaction and inattention." *Allied Realty v. Borough of Upper Saddle River,* 221 *N.J.Super.* 407, 418, 534 *A.*2d 1019, 1024 (App.Div.1987), *certif. denied,* 110

*N.J.* 304, 540 *A.*2d 1284 (1988). The purpose of these time limits is to expedite decision-making on land use applications. *Lizak v. Faria,* 96 *N.J.* 482, 492, 476 *A.*2d 1189, 1194 (1984).

Despite the mandatory nature of the language, courts have denied automatic statutory approval to a development application "especially where the municipal board's failure to act within the statutory deadline is technical or inadvertent, and where there is no evidence of intentional delay or inattention to the application." *Eastampton, supra,* 354 *N.J.Super.* at 193, 805 *A.*2d at 470. *See also Manalapan Holding Co. Inc. v. Planning Bd. of Hamilton Township,* 92 *N.J.* 466, 476, 457 *A.*2d 441, 446–47 (1983); *Star Enter. v. Wilder,* 268 *N.J.Super.* 371, 375–77, 633 *A.*2d 1001, 1003–04 (App.Div.1993); *D'Anna v. Planning Bd. of Washington Township,* 256 *N.J.Super.* 78, 82–83, 606 *A.*2d 417, 419 (App.Div.), *certif. denied,* 130 *N.J.* 18, 611 *A.*2d 656 (1992); *Allied Realty, supra,* 221 *N.J.Super.* at 418–20, 534 *A.*2d at 1024–25. Thus, courts have been reluctant to uphold an automatic approval absent a clear showing of purposeful delay. For example, the failure to timely act on an application has been excused where a board was operating under an understandable misconception of law, *Manalapan Holding Co., supra,* 92 *N.J.* at 480, 457 *A.*2d at 448–49, and *Allied Realty, supra,* 221 *N.J.Super.* at 418–19, 534 *A.*2d at 1024–25; where a decision was defective because of an inadvertent and technical violation of the law, *Precision Indus. Design Co., supra,* 185 *N.J.Super.* at 18, 447 *A.*2d at 191; where inaction was the product of inadvertent mistake, such as misplacing the development application, *D'Anna, supra,* 256 *N.J.Super.* at 83, 606 *A.*2d at 419; or where the applicant appeared to consent to an extension of time, *Star Enter., supra,* 268 *N.J.Super.* at 376–77, 633 *A.*2d at 1004.

In *Allied Realty, supra,* this court rejected automatic approval because we found:

[N]o hint of bad faith, sharp practice, overreaching or dilatory conduct on the part of the Board. The record is totally devoid of any evidence of prevarication or obstructionism by the municipality. Rather, the course of events created by the parties bespeaks innocent inadvertence and misapprehension. The remedy of

automatic approval under the circumstances here would be disproportionately weighed against the public interest.

[221 *N.J.Super.* at 419–20, 534 *A.2d* at 1025.]

Here, plaintiff submitted its cluster plan application on March 16, 2000 and claims it was complete on April 24, 2000, when it was informed in writing that its application would be recommended to the Board as complete. The next day, April 25, 2000, however, plaintiff was notified that its application would not be recommended as complete and that a number of elements required clarification, among them whether or not the property owner's consent to the filing of the application, which had been withdrawn, was necessary in order for the application to be considered complete.

On September 13, 2000, after determining that New Jersey law did not require the consent of a property owner to a contract purchaser's filing of a development plan in order for the contract purchaser's application to be considered complete, the Board notified plaintiff that its application was complete. Public hearings were scheduled for November 13, 2000. Following an adjournment, requested by plaintiff, public hearings proceeded on December 11, 2000 and February 12, 2001.

■ Plaintiff argues that pursuant to *N.J.S.A.* 40:55D–10.3, its application should have been deemed complete 45 days after its submission, namely on May 1, 2000. Thus, by virtue of the automatic statutory approval mechanism in *N.J.S.A.* 40:55D–48(c), plaintiff asserts that its application should have been granted default approval 95 days thereafter, on August 4, 2000. We disagree.

Plaintiff's application "lack[ed] information indicated on a checklist adopted by ordinance and provided to the applicant." *N.J.S.A.* 40:55D–10.3. The Board's initial letter of April 24, 2000 contained such an itemized checklist, as did all of its subsequent correspondence dealing with the completeness of plaintiff's application. Thus, plaintiff's argument that *N.J.S.A.* 40:55D–10.3 triggered the 95 day statutory period on May 1, 2000—45 days after its initial

submission on March 16, 2000—resulting in an expiration of the period on August 4, 2000, is erroneous. Rather, the date which triggered the commencement of the 95-day period set forth in *N.J.S.A.* 40:55D–48(c) is September 13, 2000.

Prior to September 13, 2000, as the trial court found, a legitimate dispute existed between the parties as to whether a development application filed by a contract purchaser required the consent of the property owner to be considered complete. While incorrect, there is no indication that the Board's position was anything other than an understandable misconception of the law, demonstrating neither "bad faith [n]or obstructionism by the [Board]." *Manalapan Holding Co., supra,* 92 *N.J.* at 482, 457 *A.*2d at 450. As we held in *Eastampton, supra,* to sustain default approval of the application on the facts here "is to say that a Board that errs in good faith, in determining that an application is incomplete, risks automatic approval of an arguably incomplete application. That was not the intention of the Legislature in enacting the default approval statutes." 354 *N.J.Super.* at 196, 805 *A.*2d at 471. *See also Allied Realty, supra,* 221 *N.J.Super.* at 418, 534 *A.*2d at 1024.

We agree with the trial court that no evidence of bad faith appeared in this record and accordingly, affirm its denial of automatic statutory approval.

The judgment of the Law Division is reversed in part and affirmed in part. The decision of the Bethlehem Planning Board, rejecting plaintiff's cluster development application, is reinstated.