**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3387-19

BARBARA CAMACHO,
NATHALIE COOK,
CHERYL MORRISON,
JOANNE GORMAN,
CURTIS ALLEN,
JOHN ALLEN, and
SHEILA MUHAMMED,

     Plaintiffs-Appellants,

v.

CITY OF JERSEY CITY
ZONING BOARD OF
ADJUSTMENT and INN
AT GARFIELD, LLC,

     Defendants-Respondents.

_____

Argued June 2, 2021 — Decided June 17, 2021

Before Judges Haas and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3742-19.

Robert F. Simon argued the cause for appellants (Herold Law, PA, attorneys; Robert F. Simon, of

counsel and on the briefs; George W. Crimmins III and Cara A. Murphy, on the briefs).

Vincent J. LaPaglia, Esq. argued the cause for respondent City of Jersey City Zoning Board of Adjustment (The Law Offices of Vincent J. LaPaglia, Esq., attorneys; Vincent J. LaPaglia and Genevieve A. LaPaglia, on the brief).

Gregory J. Castano, Jr. argued the cause for respondent Inn at Garfield, LLC (Castano Quigley, LLC, attorneys; Gregory J. Castano, Jr., on the brief).

PER CURIAM

Plaintiffs Barbara Camacho, Nathalie Cook, Cheryl Morrison, Joanne Gorman, Curtis Allen, John Allen, and Sheila Muhammed appeal from an April 3, 2020 order dismissing their complaint in lieu of prerogative writs, which challenged an application for final site plan approval by defendant Inn at Garfield, LLC (Garfield) and a resolution by defendant City of Jersey City Zoning Board of Adjustment (Board) approving the application. We affirm.

The Board held a hearing over the course of two days, heard testimony from expert witnesses presented by Garfield and plaintiffs, and heard from members of the community in favor of and against the project. We take the following facts from the record.

Garfield applied to build a four-story twelve-unit dwelling across three contiguous vacant lots located on the corner of Garfield and Pearsall Avenues

within an R-1 Zone in Jersey City. The R-1 Zone allows for one- and two-family homes. The proposed building included a lobby, a courtyard open to the public, and on-site parking for each unit on the ground floor. The remaining three stories were for the dwellings, which included a roof-top deck and green roof. Garfield sought variances pursuant to N.J.S.A. 40:55D-70(c) and (d) for the: number of units; height of the units; side yard setback; rear yard setback; front yard setback; parking space dimensions; and building coverage for the property.

Garfield's application addressed the "positive" and "negative" criterion, N.J.S.A. 40:55D-70(c)(1) and N.J.S.A. 40:55D-70(d), arguing the benefits of the proposed project substantially outweighed potential detriments because it would significantly improve the vacant property. Garfield also argued granting the variance would advance the purposes of the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -63, and promote the general welfare within the meaning of N.J.S.A. 40:55D-2(a) because "[t]he project is proposing a density that is consistent with other multi-family buildings located along Garfield Avenue, and therefore promotes the establishment of appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods, communities; consistent with N.J.S.A. 40:55D-2(e)."

Regarding the use variance, Garfield noted the property was particularly well suited to accommodate the building because "[t]he subject property is an oversized, corner lot with a total of 6,630 square feet, which is significantly larger than the 2,500 square foot lot size required in the R-1 District." It also noted "[t]he proposed multi-family building is consistent with other multi-family buildings located along Garfield Avenue, which is a major thoroughfare in Jersey City, and in the surrounding area."

Regarding the height variance, Garfield stated:

> the subject property can accommodate the increased height of the proposed building and is consistent with other buildings within the surrounding area. From an urban design standpoint, the property location, on a corner, supports the increased height. Furthermore, the proposed project provides adequate setbacks from the adjacent residential structures, preserving light and air. The proposed project provides an approximate [three]-foot setback from the adjacent structure to the west along Garfield Avenue, which is itself built to the lot line. From the south, along Pearsall Avenue, the building is set back [twenty] feet from the adjacent structure. In total, the proposed building will cover approximately [sixty percent] of the property.

Garfield argued its building "will promote a more desirable visual environment through creative development techniques . . . by [re]placing the vacant lot with a new modern building." It noted the project advanced the Jersey City Master Plan "by developing a currently vacant lot, which will provide [a]

4

unique, attractive, and high-quality residential area that will serve existing residents and attract new residents with a wide range of housing and life-style choice."

Notice of the hearing on Garfield's application was issued on May 13, 2019, and included details of the proposed project and variances sought. In relevant part, the notice stated: "The purpose of this application is to . . . [c]onstruct a new four . . . story, twelve . . . dwelling unit building with twelve . . . parking spaces across three . . . lots in the R-1 zone." The notice also stated "[a]ny person interested in this application will have the opportunity to address the Board at the meeting of May 23, 2019 at 6:30 p.m. in the Council Chambers of City Hall . . . ."

The Board held the first hearing on May 23, 2019, during which Garfield presented testimony from an architect and a professional planner. The architect's testimony addressed each facet of the application, including setbacks, ingress and egress from the property, tree plantings on the ground level, unit height, parking, utilities and fire safety, apartment lay outs, and building façade and exterior construction materials.

The planner's testimony addressed the zoning aspects and variances needed for the project and was equally comprehensive. The planner explained

a (d)(1) use variance was necessary since multifamily use was not permitted in the zone where the property is located, as well as a (d)(6) building height variance since the proposed building height exceeded the maximum permitted height in the zone. He testified the purpose of the R-1 Zone is "to encourage infill residential development." He noted the corner lot was a vacant property and over the years served as a dumping ground for "various garbage product[s]" and development of the lot would eliminate the dumping problem.

The planner also addressed the density issue by pointing out similar structures in the neighborhood. He stated:

> Currently this property is three lots that all front onto Garfield Avenue. In their own right, they're all undersized lots. So they would be entitled to make an application, but notwithstanding, an application for a conforming two-family unit would require substantial variances because of the undersized lots and it would likely need relief from this Board.
>
> So what we've done on this application is consolidate that lot, or propose to consolidate that lot and provide a larger structure.
>
> Further north, on Garfield Avenue, just to orient the Board, there's a large . . . apartment building. This is a much older building. The brick on it is decades old. I don't know when it was built. This structure, four and a half stories, it has [forty-four] units. When you aggregate that to the acreage in terms of density, that's approximately 180 units an acre.

6

Further south on this intersection of Winfield Avenue and Garfield, there's a building that contains five units with a density on that property of 100 units an acre.

There are other multifamily developments throughout this area that are approximately within this four-block radius that we've kind of evaluated. There are approximately [twenty-five] other multifamily buildings. They range in density from [twenty-five] units on the three-family, which would be considered a multifamily in this zone, all the way up to that 189 unit multifamily . . . building here.

Putting in perspective, what's being proposed on this lot is a [twelve] unit building and the density on this size property, 6,600 square feet, is [seventy-nine] units an acre. So we're certainly within that threshold . . . on the low end of [twenty-five] all the way up to 186. So when you're comparing apples to apples, this lot is appropriate for a [twelve] unit building. It's within that existing range of multifamily buildings within these four-block radius[es].

The planner also explained the onsite parking would offset any impacts on on-street parking in the neighborhood and would reduce the number of curb cuts by having one garage entrance to the building.

The planner testified the building was consistent with the Jersey City master plan because the architecture "harness[ed]" the aesthetics of other existing structures, is consistent with other multi-family dwellings in the city, and also met the diversity in housing envisioned by the master plan. He opined

A-3387-19

the building was the "appropriate density for the site. It's a large enough size. . . . It's certainly not considered a high-rise building by Jersey City standards." In addition to the rooftop deck, he noted "the element of the courtyard in the rear . . . that will be . . . accessible . . . . It will provide for an amenity space not only for the tenants, but anyone who wants to come [to] sit and relax under the [shade] in a garden setting."

The planner further testified as follows:

> With respect to the [(d)(6)] height variance, obviously what we're proposing is a four-story structure with an overall roof height of . . . [forty three] feet. To put it in perspective, this Board may be aware that in [the] R-1 [zone], a three-story structure is permitted; what's being proposed is four. But the actual overall height . . . what's permitted . . . is [thirty nine] feet for a flat roof and [forty four] feet for a sloped roof.
>
> And I'm not trying to split hairs, but my point being is that it's well within reason of a consistent permitted building. Forty-three feet, in my opinion, for a four-story structure is an efficient use of the building height and it's consistent with other permitted uses in the area or other permitted building height in the area.
>
> The adjacent multifamily structure to the north on Garfield Avenue [is a] four-and-a-half-story structure[;] we're actually less than that in building height when you compare it based on me counting brick. That's how I was able to estimate that building height.

A-3387-19

Addressing the setbacks, the planner explained a zero-foot setback would be appropriate because it would accommodate the parking by maximizing the ground floor parking area. Responding to neighborhood concerns, the planner explained the site plan includes a proposal for a stormwater detention system "that will be sized appropriately for the lot and the building to offset any sort of mitigation." Regarding the negative criteria, the planner testified in terms of the building mass

> as the sun casts a shadow, most of the impact will be to the street and the intersection, which serves as a mitigating factor to the building mass.
>
> We provide enough separation from structures to mitigate and provide for light and air, so there's no substantial impact there. And this building will be designed to modern building code standards, so everything in the plan that the architect covered is appropriate and beneficial and future residents will not have any sort of impacts on their livelihood.
>
> With respect to the second prong of the negative criteria, no substantial impairment of the zone plan, I want to recognize that this is an R-1 district that permits one- and two-family homes. But as I mentioned earlier and through our evaluation of this neighborhood, there are a number of other multifamily structures. This really does try to accomplish the goal of creating an infill residential project which will help preserve the integrity of the area and complete that block. So I do think there are advantages to this application and what's being proposed here that really try to advance the

9

purposes of zoning and advance the purposes of zoning and advance the goals and objectives of the R-1 district.

Plaintiffs also presented testimony from a planner. The planner testified the proposed building "is a very difficult design, and the reason is there's too many units on the property. The applicant does not have anything close to the residential site improvement standards." He claimed the variances sought by Garfield did not justify constructing one building on three lots and that Garfield could have applied for (c) variances to build three single family dwellings on each of its three lots, which would have been more suitable. Plaintiffs' planner testified Garfield instead

> wants three [(d)] variances: A use that's not permitted in the zone, a height that is not permitted — and I would say it's both stories. The reason that the [MLUL] says you get a [(d)(6)] variance when you're [ten] percent or [ten] feet over, [is that ten] feet is a story. This is a full story above what is permitted. And this is a density variance also. The applicant has effectively much more density than is permitted by right.
>
> So, in my opinion, there are no public purposes that are legitimately advanced by this. The applicant talks about the most appropriate use of land. Well, that's not something you make up. The zoning ordinance tells you what the most appropriate use of land and the master plan tells you what the most appropriate use of land is here and it's one- and two-family dwellings.

The applicant has to show particular suitability. This is a lot that is a composite of three lots. They can build three conforming uses on this property. That's not a hardship. That's what the zoning ordinance was looking for. What's appropriate by having a building that is too big, too dense?

The applicant talks about a [twenty]-foot rear yard. It's supposed to be [thirty-five] feet. Well, actually, it's [sixteen] feet in the rear yard because there are balconies on the back of the buildings. So we're going to have people now [sixteen] feet from the rear property line, which is supposed to be [thirty-five] feet.

. . . .

When the application was presented, there's something like public space in the back. Well, you're supposed to have public space and you're supposed to have it in proportion to the building coverage. That's one of the variances they want. Although the applicant is going to let, you know, tenants use the open space, the answer is that's fine except the applicant doesn't have enough. This is a regular shaped property. Again, it could be developed with three conforming uses. Maybe some [(c)] variances, but no [(d)] variances.

In terms of the negative criterion, . . . the building is too close to the front property lines. Clearly out of character with the area. The building is too tall. . . .

It is clearly substantially detrimental to the zone plan and zoning ordinance. Your master plan and your zoning ordinance are in sync. If you think that the Planning Board didn't know what the land use pattern was in the area, that's incorrect. This . . . neighborhood from 1912 on has largely stayed the way it is. This is an anomaly of the area.

In my opinion, there are no special reasons. The [(d)1] variance is the hardest variance to get. It's the [Medici[1]] standard where you have to show not only peculiar suitability, but you have to show why it's not detrimental to the public good or does not impair the zone plan and zoning ordinance by an enhanced burden of proof. You have to really go through the standards. I don't think the applicant has met those standards.

After testimony from plaintiffs' planner, members of the community asked questions about the application. Then the meeting was adjourned to June 27, 2019.

When the matter returned, the Board continued to hear testimony from community members regarding the building's effects on traffic and noise level, the public works system, garbage, and the building's proximity to other structures and the effects it would have on privacy. The Board also heard testimony from a community member who supported the project because it would occupy the vacant land and would "no longer [be] a drug spot."

Garfield responded it would address the privacy concerns by re-orienting the rooms in the building. Garfield also stated it would contain the building's garbage inside the building so as not to combine with garbage from neighboring properties and avoid encouraging rodents and other animals.

---

[1] Medici v. BPR Co., 107 N.J. 1 (1987).

The Board passed a seventeen-page resolution in favor of the project and made the following findings of fact:

> 17. The [a]pplication secures safety from fire, flood, panic and other natural man-made disasters in accordance with purpose B of the MLUL by proposing a detention system designed to collect all water runoff generated on-site as well as approximately green roof area and landscaping;
>
> 18. The [a]pplicant continues efforts to stabilize and upgrade residential neighborhoods and protects and preserves residential neighborhoods from intrusion by non-residential uses in accordance with the Land Use Objectives of the Jersey City Master Plan;
>
> 19. The overall site design mitigates issues related to the bulk standards for the R-1 Zone;
>
> 20. The proposed use is suited to the [p]roperty because the site is considered oversized;
>
> . . . .
>
> 24. The overall site design mitigates issues related to the bulk standards for the R-1 Zone;
>
> 25. Garfield Avenue is more suitable for the proposed [seventy-nine] units per acre when compared to adjoining streets.
>
> 26. The [a]pplicant studied below grade parking and determined it was not feasible and would reduce the number of parking spaces.
>
> 27. The [a]pplicant did not perform a formal shadow study because of the [p]roperty's location on

13

the block. Virtually all of the shadow cast from the building would be cast in the intersection. The sun rises in the east and Garfield Avenue itself will absorb much of the shadow. Later in the day as the sun sets in the west the shadow will be cast into Pearsall Avenue itself.

28. The proposed building height is marginally greater than [the] maximum permitted in the R-1 zone would be.

29. The [a]pplicant has agreed to reduce the floor to ceiling heights which would, in turn, reduce the height of the building to mitigate objector concerns.

30. The [a]pplicant has agreed to move the garbage storage inside of the building to mitigate objector concerns.

31. The [a]pplicant has agreed to work with Division of Planning Staff on the façade design and elements to mitigate objector concerns.

32. The [a]pplicant has worked with the municipal water authority in designing this development. The [a]pplicant is expected to share the costs of infrastructure upgrades scheduled to begin in September 2019;

33. The [a]pplication would create a single curb cut on Pearsall Avenue. An as-of-right project would create three curbcuts on the busier Garfield Avenue.

34. The [a]pplication advances the general welfare and public good of . . . New Jersey and . . . Jersey City in accordance with purpose A of the MLUL by advancing the redevelopment of the site, providing one parking space per unit, providing green roof, stormwater detention system, bicycle parking spaces,

14

and providing ADA [(Americans with Disabilities Act)] compliant units; and

35. The [a]pplication provides sufficient space in appropriate locations for a variety of uses in order to meet the needs of all New Jersey citizens in accordance with purpose G of the MLUL by providing spacious units that are ADA compliant and one parking space for each unit as well as outdoor community space; and

36. The [a]pplication promotes a desirable visual environment through creative development techniques and good civic design and arrangement in accordance with purpose I of the MLUL through the new construction of a twelve-unit, four-story brick building on a vacant oversized lot; and

37. The [a]pplication establishes appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods and communities consistent with purpose E of the MLUL;

38. There are no substantial detriments to the public welfare. The proposed project involves the construction of an in-fill, multi-family residential development on a vacant parcel in a residential neighborhood. The proposed setbacks provide adequate light and air to adjacent structures. The new building which meets all current building codes, including egress, sprinklers, etc.

39. Granting the variances will likewise not result in a substantial detriment to the intent and purpose of the zone plan and zoning ordinance. The purposes of the R-1 District include "encouraging compatible in-fill development" and "preserving the integrity of residential neighborhoods." The proposed

15

use is consistent with, and promotes, the residential character of the neighborhood.

40. The proposed project advances the Jersey City Master Plan by developing a currently vacant lot, which will provide unique, attractive, and high-quality residential area that will serve existing residents and attract new residents with a wide range of housing and life-style choice.

The Board approved the application for the (d) and (c) variances subject to certain conditions. Relevant to the issues raised on this appeal, the Board required Garfield to reduce the overall height of the building by two feet and relocate the trash room inside the building.

Plaintiffs filed a complaint in lieu of prerogative writs challenging the resolution. They argued Garfield did not meet its burden of proof as to the (d) variance application, failed to obtain a (c) variance, and failed to meet minimum parking requirements. Plaintiffs also argued Garfield's experts had offered net opinions because they failed to conduct a shadow study and the Board erred in accepting their testimony and concluding the building's height was permitted. They also argued the Board's findings were not based on the evidence and there was inadequate notice to the public of the hearing.

Judge Mary K. Costello issued a comprehensive written decision addressing each of plaintiffs' claims and entered an order dismissing the

16

complaint. At the outset, the judge found Garfield had met its burden to show the project did not negatively impact the master plan and was not contrary to the zoning ordinance. She noted plaintiffs' expert relied on a map dating to 1912, which purported to show the character of the property and the surrounding neighborhood and that Garfield's lots had been unimproved. However, Garfield proved the lots were previously occupied by two four-story multi-family dwellings, one of which contained eight units and the other nine.

The judge also noted the Board addressed and made findings regarding the positive criteria when it

> cited to the record and found that the development of the property would promote the general welfare by transforming vacant lots that had been attracting trash and drug-trafficking. (Finding #34). The Board found that the project would provide needed housing and would meet the parking requirements. (Finding #17). The Board also addressed the notion that the project would address environmental concerns such a water runoff and detention. (Finding #17). The Board cited favorable findings on population density and concentration. (Finding #37). The Board cited with favor the ADA-compliant units and outdoor community space. (Finding #35).

> In addition to these general findings, as to the issue of "particular suitability," the Board found that because each of the single lots is undersized, any development of any one of the lots would inevitably require Board action in the future. The merger of the three lots, and the proposed project design being

17

entirely residential, would not offend the master plan or the zoning ordinance, especially since there had been two multi-family buildings on the site previously. This precedent as well as the fact that the newly proposed project would have off-street parking was of particular note regarding site suitability.

The judge found the Board also addressed the negative criteria. She noted

the Board made specific findings regarding lack of detrimental impact on public welfare (Finding #38) and lack of detrimental impact on the master plan and zoning ordinance (Finding #39[ ]and #40). Nine specific notations were made in the record to aspects of the project that either affirmative[ly] promote or are not a detriment to the general welfare. . . .

It cannot be said that [Garfield] did not address the issues. Nor can it be said that the Board was derelict in their duty to canvass the proofs, cite to the record and make specific findings on the positive and negative criteria. As such, this court finds that [Garfield] met its burden of proof and that the Board did not act arbitrarily or capriciously in approving the (d)(1) variance.

The judge rejected plaintiffs' argument the lack of a (c) variance was fatal

to Garfield's application. She noted

[i]t is . . . well settled that . . . the (c)(2) variance(s) become "subsumed" in the (d)(1) variance application. While the Board may not ignore the (c)(2) bulk variances, when they are considered in conjunction with (d)(1) variances, they may be considered as ancillary to the [principal] relief sought. Price [v. Himeji, LLC, 214 N.J. 263, 301 (2013).]

18                                                          A-3387-19

The judge concluded as follows: "In this case, this very issue is addressed specifically in findings #10[2] and #24. These findings are fully supported by the ample record and nothing therein can be deemed arbitrary or capricious."

The judge rejected plaintiffs' argument regarding the building's effects on the parking conditions in the neighborhood. She found "[t]he prevailing ordinance in Jersey City requires one parking space per unit. Here, [Garfield] planned for [twelve] spaces for [twelve] units."

The judge also rejected plaintiffs' argument Garfield's experts had offered a net opinion. She noted the lack of a shadow study was not grounds to exclude the expert testimony presented on Garfield's behalf, but rather "goes to the weight to be accorded [to] the experts' testimony." The judge noted "the height issue was but one of many considered as part of the bulk variance analysis." The judge found plaintiffs' arguments the Board had improperly delegated its

---

[2] This finding read as follows:

> 10. The [a]pplicant is proposing four . . . stories when three . . . stories are permitted. Additionally, the [a]pplicant is proposing a twelve . . . unit multi-family building, which is not a permitted use in the R-1 Zone. There is one . . . "C" variance required for compact spaces. Additionally, while subsumed under the use variance, there are nonconformities based on R-1 bulk standards.

 A-3387-19

decision-making duties to the experts and the claim of inadequate notice for the

hearing "not worthy of further discussion."

The judge concluded as follows:

> Applicant deftly pointed out that prior development on the site was denser and did not conform to parking requirements whereas this project was less dense and provided necessary parking.  This goes directly to the required showing of why the proposed use can be reconciled with the prevailing ordinance.
>
> As many as four meetings were held prior to the hearings wherein the parties negotiated the height of the building and changes were made to the design.  This disposes of the argument by [plaintiffs] now that the Board did not [assess] the height deviation.  The precedent of the prior development adequate[ly] addresses the "particular suitability" standard.
>
> The presumption of validity of the decision of the Board has not been rebutted in this case.  There was no density requirement to address or comply with.  This project and the parking plan inherent in it will not impact the street parking at all.  The Board did not ignore the (c)(2) variances.  They were identified and reviewed by the Board within the context of their consideration of the (d)(1) use variance.  For these reasons, the resolution of the Board is found to be free of any arbitrary or capricious characteristics.

On appeal, plaintiffs raise the following points:

POINT I:

THE COURT COMMITTED REVERSIBLE ERROR
BY UPHOLDING THE BOARD'S ERRONEOUS

DETERMINATION THAT THE APPLICANT SATISFIED THE POSITIVE AND NEGATIVE CRITERIA REQUIRED FOR A USE VARIANCE UNDER N.J.S.A. 40:55D-70(d)(1).

POINT II:

THE COURT BELOW COMMITTED REVERSIBLE ERROR BY:

>   (a) holding no density standard exists despite the fact all parties had concurred that a standard exists; and

>   (b) failing to the invalidate the Resolution for failure to grant a density variance under N.J.S.A. 40:55D-70(d)(5).

POINT III:

THE COURT BELOW COMMITTED REVERSIBLE ERROR BY CONSIDERING THE HEIGHT VARIANCE TO HAVE BEEN SUBSUMED INTO THE USE VARIANCE, AND BY DECLINING TO ADDRESS THE BOARD'S ARBITRARY AND CAPRICIOUS ADOPTION OF THE HEIGHT VARIANCE.

POINT IV:

THE COURT COMMITTED REVERSIBLE ERROR BY APPLYING A LOCAL ORDINANCE SETTING MINIMUM PARKING STANDARDS THAT ARE SUPERSEDED BY MORE STRINGENT REQUIREMENTS UNDER THE RESIDENTIAL SITE IMPROVEMENT STANDARDS AND NEW JERSEY LAW.

POINT V:

THE COURT BELOW COMMITTED REVERSIBLE ERROR BY DECLINING TO ADDRESS THE MANY EGREGIOUS DEFICIENCIES IN THE APPLICANT'S PUBLIC NOTICE THAT DEPRIVED THE BOARD OF JURISDICTION TO HEAR THE APPLICATION, AND THE BOARD'S IMPERMISSIBLE DELEGATION OF ITS DUTIES AS TO THE APPROVAL OF CRITICAL ELEMENTS OF THE DEVELOPMENT PLAN.

"[W]hen reviewing the decision of a trial court that has reviewed municipal action, we are bound by the same standards as was the trial court." Fallone Props., L.L.C. v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004). Thus, our review of the Board's action is limited. Bressman v. Gash, 131 N.J. 517, 529 (1993) (holding that appellate courts are bound by the same scope of review as the Law Division and should defer to the local land-use agency's broad discretion).

In reviewing a municipal zoning board's decision, courts must be mindful that the Legislature vested these boards with the discretion to make decisions that reflect the character and level of development within their municipality. Booth v. Bd. of Adjustment of Rockaway Twp., 50 N.J. 302, 306 (1967). A planning board's discretionary decisions carry a rebuttable presumption of

validity. Harvard Enters., Inc. v. Bd. of Adjustment of Madison, 56 N.J. 362, 368 (1970).

It is well-established that "a decision of a zoning board may be set aside only when it is 'arbitrary, capricious or unreasonable.'" Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment of W. Windsor Twp., 172 N.J. 75, 81 (2002) (quoting Medici, 107 N.J. at 15). "[P]ublic bodies, because of their peculiar knowledge of local conditions, must be allowed wide latitude in their delegated discretion." Jock v. Zoning Bd. of Adjustment of Twp. of Wall, 184 N.J. 562, 597 (2005). Therefore, "[t]he proper scope of judicial review is not to suggest a decision that may be better than the one made by the board, but to determine whether the board could reasonably have reached its decision on the record." Ibid.

The burden is on the challenging party to overcome this highly deferential standard of review. Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327 (1998). A court must not substitute its own judgment for that of the local board unless there is a clear abuse of discretion. See Cell S., 172 N.J. at 82. As we stated in CBS Outdoor, Inc. v. Borough of Lebanon Plan. Bd., 414 N.J. Super. 563, 577 (App. Div. 2010), "[e]ven were we to harbor reservations as to the good judgment of a local land use agency's decision, 'there can be no judicial declaration of invalidity in the absence of clear

abuse of discretion by the public agencies involved.'" (quoting Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296-97 (1965)).

Applying these standards, we discern no basis to disturb the Board's reasoned decision to approve Garfield's application and the variances. The Board's decision is clearly supported by sufficient credible evidence in the record and is not arbitrary, capricious, or unreasonable. Plaintiffs' arguments are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons set forth in the Board's lengthy resolution and Judge Costello's cogent decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3387-19